Swink's Adm'r v. Snodgrass.

~~~~~~~~~~~~

## SWINK'S ADM'R vs. SNODGRASS.

1. A sale of property of an estate, under an execution on a judgment rendered against the decedent after his death, is void and vests no title in the purchaser.

2. An administrator *de bonis non* is entitled to all the goods and personal estate of the deceased, which remain in specie, and were not administered by the first administrator.

3. If an administrator fraudulently disposes of the assets of the estate to one, cognizant of the fact that he is acting in violation of his trust, the sale is void, as against those whose rights are thereby injured.

4. Where assets of the estate have been fraudulently disposed of by the administrator in chief without consideration, an administrator *de bonis non*, if they can be identified, may recover them in an action at law.

Error to the Circuit Court of Madison. Tried before the Hon. Thos. A. Walker.

THE plaintiff, as administrator *de bonis non* of George Swink, deceased, brought an action of detinue against the defendant in error, to recover certain slaves. On the trial it appeared that the slaves belonged to the intestate at the time of his death. It was also shown that the administrator in chief obtained an order from the Orphans' Court to sell the slaves and other personal property of the estate, by virtue of which he offered the slaves for sale at public auction. On the day of the sale, they were levied on by the sheriff to satisfy an execution against the intestate, but the administrator, denying the right of the sheriff to make the levy, interposed a claim to them and proceeded to sell. The slaves were bid off by Stephen Carter, who was requested by one Harris to bid for them on his account. Car-

ter, being examined as a witness, stated, that he was requested the day after the sale to receive possession of the slaves, and he then concluded, if Harris did not pay for them, to become the purchaser of them himself. He also stated that when he received the slaves, it was agreed between him and the administrator, that he should keep them until the question of their liability to satisfy the execution was decided, and if it was decided that they were not liable, he was to give his notes and security for the purchase money; but if the slaves were subjected to the execution, then the contract of sale was to be void. This statement of Carter was corroborated by the return of the administrator, showing the character of the sale. With this understanding between the administrator and Carter, he (Carter) took possession of the slaves and sent them to the house of Harris, who had married his daughter. Carter further stated that he had never paid for them, nor given his note for the purchase money, nor had the administrator ever executed to him a bill of sale of the slaves, and that the only right he claimed to the slaves was to retain them until it was seen whether a good title could be made by the administrator. The evidence of one Riddle showed that Harris ran the slaves to Mississippi, and that this was done with the consent of the administrator. The slaves were pursued by an agent of the Bank at Decatur and brought back to Alabama. It further appeared that Swink, the intestate, was indebted to the Bank on a bill of exchange, on which judgment had been rendered after his death, and that Harris, who ran off the slaves, was a party to the same bill, and judgment had been rendered against him also. The slaves, after they were brought back to Alabama, were sold under executions issued on these judgments, and were purchased by the Bank at Decatur, which sold them to the defendant. Upon this evidence the court was requested by the plaintiff to charge the jury, that if they believed the sale of the slaves to Carter was upon a condition, which had not been complied with, this conditional sale did not divest the estate of the deceased of title, although possession was delivered and was to continue until it was ascertained whether the administrator could comply with the condition. The court gave this charge, but afterwards qualified it by saying, that if the condition annexed to the sale on the day after it was made was a sham or fraud on creditors

then the conditional delivery did not affect the original sale, and for the purpose of ascertaining the fact, whether this delivery was a sham to decieve the public and defraud the creditors, the jury should look to all the circumstances before them, and particularly to the testimony of Riddle to ascertain whether the administrator in chief connived at the running off of the slaves by Harris. To this qualification of the charge requested the plaintiff excepted, and now assigns it as error.

ROBINSON, for the plaintiff:

1. The sale under the execution against Swink, the intestate, issued on a judgment rendered after his death, passed no title to the purchaser.—Lucas v. Price, 4 Ala. 681; Jones, adm'r, v. Swift, 12 ib. 147; Henderson & Hudson v. Gundys, 11 ib. 433; Boyd, adm'r, v. Dennis, 6 ib. 56; Fryer's Adm'r v. Dennis, 3 ib. 254; Snodgrass v. Cabiness, 15 ib. 160.

2. The sale by the administrator being conditional, did not pass the title to the purchaser. As the proof shows that this condition was never performed, the title is still in Swink's administrator. This the court charged the jury at the request of plaintiff, but qualified the charge by telling the jury if they believed this condition was a sham or fraud upon creditors, then the condition did not affect the sale. It certainly cannot be successfully maintained that a fraudulent combination between the administrator and the purchaser to make a sale in such way as to deprive the creditors of said estate of their rights, shall divest said estate of its title to the property sold.

By a private sale the administrator does not pass any title to the purchaser.—Fambro v. Gant, 12 Ala. 298.

If a private sale passes no title, a fraudulent sale certainly ought not. A private sale passes no title, because the law forbids such sales to be made: And this inhibition was made for the express purpose of preventing unfair or fraudulent sales. Being made for this purpose, it does seem to me that it would not do to say that fraudulent sales shall pass title.

CLAY & CLAY, for the defendant:

The qualification by the court of the charge asked by the plaintiff was correct. Certainly if the sale was absolute, and the condition annexed the following day was unreal and feigned

—a sham or fraud against creditors—then the sale was not affected by the condition. Common sense and good morals, no less than law, sustain this proposition. It requires no argument or authority to support it. If the *sale* had been feigned and unreal, then no right would have been acquired by the purchaser; but a *real* sale cannot be impeached or invalidated by a *pretended* condition.

The sale was complete when the auctioneer's hammer was struck down, and after that C. had no right to withdraw from his contract, and S. no right to accept a higher bidder.—Story on Sales, § 461.

A contract is perfect, notwithstanding the presence of a condition *subsequent*, and is merely liable to be rescinded, on the condition being accomplished.—Story on Sales 247, n.3, § 248. And the sale to C. was perfect and only defeasible in case the administrator failed to defeat the execution levied on the negroes.

Notwithstanding the death of Swink occurred before the judgment was rendered in favor of The Branch Bank at Decatur against him and Harris, yet as the latter was served with notice and living at the rendition of said judgment, it was only *void* as to S., and *voidable* as to H.—Hood & Stinnett v. Branch B'k at Mobile, 9 Ala. 335.

We claim under the execution against Harris, by which the negroes sued for were sold, against whom we had a judgment which was valid till vacated. Hence all the authorities cited to show that our judgment against Swink was a nullity are inapplicable.

DARGAN, C. J.—It is very clear that the Bank obtained no titles to the slaves on account of the sale under the execution against George Swink, the intestate, for the judgment on which it issued was rendered after his death. The judgment as to him was void; no execution could issue upon it, nor could a purchaser under the execution, issued against the deceased, acquire any title.—Snodgrass v. Cabiness, 15 Ala. 160.

An administrator *de bonis non* is entitled to all the goods of the deceased that remain unadministered, after the death or removal from office of the administrator in chief. In the case of Wankford v. Wankford, 1 Salk. 306, Chief Justice Holt, speaking of the rights of an administrator *de bonis non*, said, "If

the goods of the intestate remain in specie they shall go to the administrator *de bonis non*, because it is notorious whose goods they are, and they can be easily distinguished;" and so in the case of The Attorney General v. Hooker, 2 P. Williams, 340, Lord Chancellor King held, that if an executor die intestate, all the personal estate of his testator, which has not been altered but remains in specie, goes to the administrator *de bonis non.* Mr. Williams, in his work upon Executors, says, "that an administrator *de bonis non* is entitled to all the goods and personal estate, such as terms for years, house-hold goods, &c. which remain in specie, and were not administered by the first executor, or administrator."—Vol. 1, 594. These authorities show that the title of the plaintiff in error depends on the question, whether the fraudulent or pretended sale of the administrator in chief gave to Harris such a title as precludes the administrator *de bonis non* from a recovery at law, for the slaves can be readily identified, and there was no question but that they belonged to the intestate at the time of his death.

The evidence tended to show that the administrator in chief never executed a bill of sale for the slaves, nor received the purchase money, nor any security for its payment, but that he fraudulently consented that Harris, into whose possession the slaves had come, should remove them from the State. Although it is certain that the conduct of the administrator would render him liable for the value of the slaves to the creditors or distributees, had they sought to charge him with their value, yet it is equally clear that such a sale could not defeat the rights of those interested to the slaves themselves, for if an executor fraudulently alien the assets of the testator in collusion with the vendee, the sale will be void. Fraud and crime will vitiate any transaction, and turn it into a mere color. If, therefore, a man concerts with an administrator and obtains the goods of the deceased at a nominal price, or a fraudulent under-value, the contract will be void, and the seeming purchaser will be held liable for their full value.—Lomax on Executors, vol. 1, 346-7; Williams on Executors, (2d American edit.) 672. Thus when the person, to whom the executor passes the property, knows that the executor is acting in violation of his trust and in fraud of the rights of others, the fraud will vitiate the transfer and render it null and void, as against those whose rights are

injured by the transfer.—Doe v. Fellows, 2 Crampt. & Jerv. 481; Dodson v. Simpson, 2 Rand. 294.

But it may be urged that a court of equity alone can interfere and set aside a fraudulent sale of the assets, made by an executor. This is certainly the usual course, and if the suit is brought by the creditors or distributees of the deceased, it can be brought only in a court of equity, because as distributees and creditors, they have but an equitable title ; but an administrator *de bonis non* may apply to a court of chancery to set aside a fraudulent sale of the assets, without joining with him either the distributees or creditors, and in his individual name recover as the representative of the estate.—Cubbedge v. Boatwright, 1 Russ. 549; William on Executors, (2d American edit.) 657. Now, if the administrator *de bonis non* may file a bill in equity in his own name to recover the assets fraudulently conveyed by the administrator in chief, I see no reason why he may not sue at law, when the assets can be identified, and the fraudulent vendee has paid nothing for them. The fraud vitiates the sale and renders his title void. Why then should we force the administrator to go into a court of equity against the vendee, whose title is void for fraud, and who has no equitable right to the goods? In our opinion, it is unnecessary. The court, therefore, erred in the charge given to the jury, for after giving the charge, that if the sale was conditional the title did not pass, unless the condition was performed, he in effect added, that if the condition was fraudulently waived by the administrator in chief, then the plaintiff could not recover. Now it is the fraud that vitiates the sale, and renders the title void, and how it can become the source of title, I cannot percieve. The defendant, so far as we can gather from the record, placed his defence on no other ground than that the fraudulent sale made by the administrator in chief was a bar to the plaintiff's recovery. In this particular case, we think, the administrator *de bonis non* might have sued Harris, through whom the defendant claims, at law, and as the defendant occupies the same position that Harris did, the suit may be sustained against him.

Let the judgment be reversed and the cause remanded.

PARSONS, J., not sitting.