# Riddle *et al.* v. Hill's Administrator.

*Action on Note given for Price of Personal Property sold by Administrator under Order of Probate Court.*

1. *Plea of ne unques administrator.* — In an action by an administrator on a contract made with himself, whether he sues individually or in his representative capacity, *ne unques administrator* is not a good plea, since the making of the contract with him is an admission of his representative character.

2. *Sale of personalty by administrator without order of probate court, or under void order.* — A sale of personal property by an administrator without an order of court, or under an order which is void for want of jurisdiction in the court by which it was rendered, passes no title to the purchaser, and no recovery can be had against him on his note for the purchase-money.

3. *Judicial proceedings during late war.* — This court, following the decision of the supreme court of the United States in the case of *Horn* v. *Lockhart* (17 Wallace, 570), holds that judicial proceedings, had in the courts of this State during the late war, so far as they did not impair, or tend to impair, the supremacy of the

[Riddle *v.* Hill's Administrator.]

national government, or the just rights of citizens under the constitution, are valid.

4. *Doubtful plea, construed against pleader.* — When a plea uses words of equivocal meaning, or is susceptible of two constructions, that meaning or construction will be adopted which is most unfavorable to the pleader.

5. *Judicial notice of public historical facts connected with late war; meaning of word " dollars" in note.* — In construing contracts made here during the late war, the courts will take judicial notice of the facts of public history as to the condition of the country and its currency at that time; and in an action on a promissory note payable in " *dollars*," which was given for the price of personal property sold by an administrator under an order of the probate court in 1863, will receive evidence of a contemporaneous parol agreement between the parties, that it should be discharged in Confederate treasury-notes. (Overruling *Hill* v. *Erwin*, 44 Ala. 661.)

6. *Estoppel against administrator from denying contract.* — When an administrator sues on a note given for the price of property sold by him under an order of the probate court, he is estopped from denying the validity of a contemporaneous parol agreement, set up in defence, that the note might be discharged in Confederate currency.

APPEAL from the Circuit Court of Marengo.

Tried before the Hon. LUTHER R. SMITH.

This action was brought by Mrs. Susan Hill, as the administratrix of the estate of her deceased husband, Charles W. Hill, against A. J. Riddle, J. E. Poelnitz, and F. N. Strudwick; and was founded on the defendants' promissory note for $1,350, dated the 13th February, 1863, and payable to the plaintiff, as administratrix, on the 1st March, 1864. The first count was in the usual form of complaint on a promissory note by the payee against the makers; while the second count contained the additional averments, that the note was given for the price of four mules, which belonged to the estate of the plaintiff's intestate, and which were sold by her under an order of the probate court of Greene county, rendered on the 5th January, 1863, on her application, and were bought at the sale by the said F. N. Strudwick. The defendants filed eight pleas. The first plea alleged that, at the commencement of the suit, the plaintiff was not the administratrix of the estate of the said Charles W. Hill; the second was the general issue, and the others were as follows : —

" 3. For a further plea," &c., " defendants say, that said note, in said complaint mentioned, was given by these defendants to said plaintiff, in this county and State, for and in consideration of four mules, sold by plaintiff to said F. N. Strudwick at the time said note bears date; and that it was understood and agreed between the parties to said contract, at the time the same was made, that the same might be discharged by the defendants by a payment thereof in Confederate currency or treasury-notes; and defendants aver, that the real and true value of said mules was, to wit, the sum of one dollar, and that the plaintiff is not lawfully, justly, and equitably entitled to recover any greater sum of money."

" 4. For a further plea," &c., " defendants say, that said

promissory note was given by defendants to plaintiff for and in consideration of four mules, sold by plaintiff to said F. N. Strudwick; and that said mules, at the time of said sale, were the property of said Charles W. Hill, deceased; and that the plaintiff sold said mules as aforesaid without any legal and valid order or decree of any court having authority in that behalf, and without any lawful authority to sell the same, and that said sale was void."

" 5. For a further plea," &c., " defendants say, that said promissory note was made and given by them to plaintiff, in this State, on the day the same bears date, for and in consideration of four mules sold by said plaintiff to defendant Strudwick, on the day and year aforesaid, under and by virtue of an order of an illegal tribunal, called the probate court of the county of Greene in this State, made on the 24th day of December, 1862, and by no other authority; a true copy of which proceedings of said illegal tribunal, in that behalf, is as follows," setting out the grant of letters of administration to the plaintiff, her petition to the probate court for an order to sell the personal property of the estate for the payment of debts, and the order of sale; " and defendants aver, that said sale of said mules was made without authority, and is void."

" 6. For a further plea," &c., " defendants say, that said promissory note was executed to plaintiff by defendants, on the day the same bears date, for and in consideration of an alleged sale of four mules by plaintiff to defendant Strudwick; that said alleged sale was made by plaintiff under and by virtue of a so-called decree, rendered by an illegal and foreign tribunal, called the probate court, in the county of Greene, and State of Alabama, while the said State was under the government of an insurgent force during the late war, a true copy of which said so-called decree is set forth in the 5th plea above pleaded. And the defendants aver, that the parties to said contract understood, or agreed, that the same should be discharged by a payment in Confederate currency, or treasury-notes; and that the plaintiff is not legally, justly, and equitably entitled to receive, according to the contract, any other or greater sum of money than the real and true value of said mules, to wit, the sum of one dollar."

" 7. For a further plea," &c., " defendants say, that on the 20th day of October, 1862, an illegal tribunal, called the probate court of Greene county in this State, made the following order, to wit," the order granting letters of administration to the plaintiff; " and defendants aver, that the said Susan Hill, at the time of the commencement of this suit, had no other power and authority to be and act as the administratrix of the estate of the said Charles W. Hill, deceased, than the above so-

called order of the said so-called probate court; and that the said appointment of her, the said Susan Hill, as such administratrix, was made by an illegal tribunal, acting under an insurgent organization against the power, laws, and constitution of the United States, and is therefore void; and that the said Susan Hill was not, at the commencement of this suit, the administratrix of the estate of the said Charles W. Hill, deceased.

" 8. For a further plea," &c., " defendants say, that on the 20th day of October, 1862, the said Susan Hill was appointed administratrix of the estate of the said Charles W. Hill, deceased, and became such administratrix, under and by virtue of an order made by an illegal tribunal, called the probate court of Greene county, Alabama, which said so-called court was a part of an insurrectionary power then defying and resisting the government of the United States; and that the said so-called court was a foreign court; and that the said Susan Hill, at the time of the commencement of this suit, became and was such administratrix by virtue of the order aforesaid, and by no other authority or power. And the said defendants further aver, that the said Susan Hill, at the time of the commencement of this suit, had not obtained any letters of administration upon the estate of said deceased in any one of the United States."

The court sustained a demurrer to the 3d, 4th, 5th, 6th, 7th, and 8th pleas; and its judgment on the demurrers is now assigned as error.

Wm. M. Brooks, for appellants.

A. B. Pittman, with R. H. Smith, *contra.*

Brickell, J. — As the judgment must be reversed, and the cause remanded, we do not propose to notice separately the several pleas, and the demurrers thereto, but to announce the principles which must control in determining the sufficiency of the pleadings, and rendering final judgment, if the pleadings disclose, in their present state, the facts of the case.

1. The contract on which the suit is founded was made with the administratrix personally, and is payable to her in her representative capacity. On such a contract, she may maintain suit in her own name; and whether she sues in her own name, or as administratrix, the plea of *ne unques administrator* cannot be interposed as a defence. That plea is a defence only where an administrator was at common law bound to make profert of his letters, as his authority to maintain the suit. *Profert* was never necessary, except when the cause of action accrued to the intestate. *Thames* v. *Richardson*, 3 Strobh. 484; *Biddle* v.

[Riddle *v.* Hill's Administrator.]

*Wilkins,* 1 Peters, 686 ; *Caller* v. *Dade,* Minor, 20. The execution of a promissory note, or other written instrument, payable to an administrator, is an admission of the representative capacity, dispensing with the necessity of profert, and, in the absence of fraud, or misrepresentation, estopping the party making it from putting in issue the existence of that capacity. *Harbin* v. *Levi,* 6 Ala. 399 ; *Talmage* v. *Chapel,* 16 Mass. 69 ; *Trotter* v. *White,* 10 Sm. & Marsh. 607 ; *Savage* v. *Meriam,* 1 Black. 176 ; *Falls* v. *Wilson,* 24 Miss. 168. The court, therefore, committed no error in sustaining the demurrer to the pleas denying the plaintiff's representative capacity. That question is not involved in this suit.

2. It is the settled law of this State, that a sale of personalty, made by an administrator without an order of court, or under an order void on its face for want of jurisdiction in the court rendering it, passes no title to the purchaser. The authorities on this point are collected, and the discussion of the question exhausted, in *Ikelheimer* v. *Chapman,* 32 Ala. 676. It is also settled, that there can be no recovery on the purchaser's promise to pay the purchase-money on such sale. *Beene* v. *Collenberger,* 38 Ala. 647, and authorities there cited.

3. From some of the pleas it appears that the appellee, under regular orders of the proper court, rendered during the war, made sale of the personalty of her intestate. At this sale, the purchase was made which forms the consideration of the promissory note, the subject of the suit. The pleas aver the invalidity of these orders, and the consequent invalidity of the sale. The invalidity of the orders is predicated on their rendition by a court of a government in hostile relations to the government of the United States. The pleas cannot be sustained. The recent case of *Horn* v. *Lockhart* (17 Wall. 570) announces the principle by which we propose to be guided in solving this vexed question. *Tarver* v. *Tankersley, Powell* v. *Young,* at the present term. That principle is, that judicial proceedings in this State, during the war, so far as they did not impair, or tend to impair, the supremacy of the national authority, or the just rights of citizens under the constitution, are to be treated as valid and binding. On this, and kindred distressing questions, the inevitable result of the war, and which are of especial interest to the people of ten States, and on which uniformity of decision is of vital importance, this court has often announced its purpose to follow the adjudications of the supreme court of the United States, when made. The settlement of these questions, so far as dependent on judicial decision, probably lies within the province of that tribunal. If it does not, yet to avoid diversity of decision on these questions, and a conflict of authority, there is, it seems to us, an eminent

propriety in state tribunals yielding obedience to its adjudications. Nor can invalidity be properly imputed to them, from any former decision of this court. All our former decisions are reconcilable on the hypothesis, that they were to be esteemed as *quasi* foreign judicial proceedings, subject to be opened because of fraud, want of jurisdiction, accident, or other cause, which would authorize the opening of judgments of a foreign tribunal, not protected by the provisions of the constitution of the United States, declaring the effect which shall be accorded in one state to the records of a sister state. The orders and the sale were valid, conferring on the administratrix the power she exercised, and passing to the purchaser the title of the intestate, all for which he contracted. The court did not err in sustaining the demurrer to the pleas affirming the invalidity of the sale, and the orders under which it was made.

4. The third and sixth pleas aver, that on the sale there was an understanding and agreement, between the administratrix and the purchaser, that the purchase-money should be discharged in Confederate treasury-notes ; and they aver the value of the property purchased, and seek to limit a recovery to such value. The complaint avers the note to have been made on the 13th February, 1863, for the payment, without contingency or qualification, on the first day of March, 1864, of thirteen hundred and fifty dollars. Construing the pleas, as they must be construed, most strongly against the pleader, it must be intended that this collateral agreement, to accept in payment Confederate treasury-notes, was by parol, and not in writing. The averments of the plea would be as fully satisfied by evidence of a parol, as of a written agreement. This being true, the maxim of pleading applies, that if the meaning of words be equivocal, and two meanings present themselves, that construction shall be adopted which is most unfavorable to the party pleading. 1 Chit. Pl. 237. As most unfavorable to the pleader, we must intend that the agreement on which he relies was by parol.

5. If this contract could be regarded as having been made by these parties when the constitution and laws of the United States were dominant, its legal effect and operation would be unmistakable. It would be a promise to pay dollars of the gold and silver coin of the United States. No evidence of a parol contemporaneous or collateral agreement to accept anything else in payment could be received. But the contract was made in this State, when the authority of the constitution and laws of the United States were suspended, and another authority was prevailing. It matters not what character shall be imputed to this authority — whether it shall be esteemed as " a government *de facto*," or a government of " paramount

force," or as the " mere offspring of treason and rebellion ; " it in fact had power and authority, which it exercised. It proclaimed laws. It gave life and circulation to a currency as money, which superseded every other currency, and every other representative of value. It was foreign to the government of the United States, more foreign to that government than was France or Great Britain ; because peaceful and friendly relations, and unobstructed intercourse between their respective citizens, existed ; while this government bore no such relations, but lived in armed defiance of the United States, and its authority.

Laying out of view the special agreement attending this particular contract, and not incorporated in it, it would be manifest injustice to subject it, and the ascertainment of its legal effect, to laws which were not actually prevailing, and which, it is fair to presume, the parties did not contemplate, when it was made. The *lex loci contractus* prevails in all tribunals, in determining the interpretation and validity of contracts, on the plainest principles of justice. How far the principle could be applied to contracts made here during the war, without offence to the constitution and laws of the United States, now of undisputed and paramount obligation, and how far it could be departed from, without injustice to individuals, and, in fact, the wrong of subjecting them to laws, if not technically *ex post facto*, yet in effect inflicting the injuries which render such laws so odious that they find no place in the jurisprudence of any civilized people, was one of the difficult questions presented immediately on the reëstablishment of constitutional relations between the State and the United States. Legislation, at an early day, in this State, sought a partial solution of the question, when the particular facts existed which are averred in this plea. Ordinance No. 26 of the convention of 1865 provides, that in all suits on contracts made between the first day of September, 1861, and the first day of May, 1865, parol evidence shall be admissible, to prove what was the consideration thereof, and whether or not the parties thereto understood or agreed that the same should be discharged by a payment in Confederate currency or treasury-notes ; and if so, or if it appears from the contract, then to show what was the real or true value of the consideration of said contract, and what amount the plaintiff is justly and legally entitled to recover according to the contract, by the judgment of the court. The ordinance proceeds on the theory, that in its absence such evidence would not be admissible, and the legal effect of the contract would compel a recovery for the sum expressed on its face, in the gold and silver coin of the United States, or that which the laws of the United States render a legal tender in

[Riddle v. Hill's Administrator.]

satisfaction of debts. If that theory can be maintained, the ordinance, to say the least of it, is of doubtful constitutionality. We are aware that its constitutionality has been, and is vindicated, on the ground that it changed only a rule of evidence. Assuming this to be true, all must feel that, in its passage, legislative power was strained to its utmost verge; that the line of distinction, between the ordinance and an enactment directly impairing the obligation of contracts, was very narrow. The ordinance did not, however, meet the necessities which the war had produced, nor subserve the purposes of justice to individuals. There was a large class of contracts, reduced to writing, expressing promises to pay " dollars," in which there was not an attendant agreement that Confederate currency should be accepted in payment. To this class of cases, the ordinance was construed not to extend. This resulted from the theory on which the ordinance was based — that the law compelled the discharge of such contracts in coin, or the currency of the United States made a legal tender; that it was an attendant agreement, varying the mode of payment, which only could relieve the contract from this legal operation. It is not mere legal presumption, resting on considerations of public policy, that the law silently incorporates itself into the contract of parties. The incorporation comports with their actual intention, most often, or they would have expressed all that the law implies.

We know, as matter of public history, that from the day of secession, gold and silver coin, or any currency convertible into it, ceased to be a circulating medium in this State. It was superseded by another currency, computed and denominated as " dollars." In all business transactions — in all buying and selling of property, it ceased to be a representative of value, and became an article of merchandise, constantly increasing in value, as compared with the prevailing currency, or any species of property. There was a law, dominant it may have been by mere force, under which the prevailing currency issued. The national currency, now the circulating medium of the country, had not been introduced here, and its introduction and use was prohibited by law,' to which force would have compelled obedience, if it had not been yielded. Shall this contract be read in the light of these circumstances, as contracts are always read in the light of circumstances surrounding the parties when made; or shall it be read as it would have been when such circumstances did not exist, and as it would be read if made now when no conflict of authority divides and distracts the country? The law, concurring with justice, requires that a judicial tribunal should look to these circumstances, in determining the legal effect of this contract, and the signification of the language the parties have employed. It is common learning,

[Riddle *v.* Hill's Administrator.]

that if a contract is made, where the words used in it have in general acceptation a significance variant from that elsewhere imputed . to them, that significance must be adopted by a judicial tribunal called to construe the contract. In England, in all other than mercantile contracts, the term "month" ordinarily means a lunar month. Here, it invariably means, if not otherwise expressed, a calendar month. The term *usance* is frequently found in negotiable instruments. Its meaning is almost as variant as the different countries in which it is employed. It would scarcely be asked of an English court to impute to the word *month*, or the word *usance*, employed in a contract made here, the meaning the law of England, or the customs of its merchants, impute to these terms, and not the meaning they bear according to the law and custom prevailing here; and yet it would be injustice of the same kind, and greater in degree, if we conclusively imputed to the term "dollars," as found in this and similar contracts, made here during the war, the significance of "dollars," employed in contracts made when the constitution and laws of the United States were prevailing without obstruction, and the only authority demanding paramount obedience. Story's Conflict of Laws, §§ 270–71.

Independent of, and without regard to a verbal agreement, contemporaneous with a written contract promising to pay "dollars," made in this State, during the war, we are of the opinion, a court called to pronounce judgment on such contract must consider the historical facts to which we have adverted, and must further inquire into other facts, which may enable it to arrive at the intention of the parties, in ascertaining what shall be the legal effect of the contract. If it is one of bargain and sale, or for services rendered, then it is a legitimate inquiry, what was the value of the thing sold, or of the services rendered, not measured by the fictitious value which an evanescent currency may have produced, but as measured with the value of the currency in which a recovery is claimed. If there is a great disparity in the two standards of value, it is a strong, if not a conclusive circumstance, that payment was to be made in the prevailing currency. We mention these contracts, only as illustrations, not as embracing every contract to which the rule is applicable. The evidence of the verbal agreement, if there was one, by which Confederate currency should be accepted in satisfaction, is only evidence of a fact, in connection with the particular circumstances surrounding the parties, aiding the court in ascertaining their intention, and the legal effect of the contract. In this point of view, no rule of evidence would be infringed. The ordinance of the convention would be merely affirmatory of the existing law; and we

[Riddle *v.* Hill's Administrator.]

prefer so to regard it, rather than as changing the law of evidence, or introductive of a new rule of evidence. In considering this question, in reference to a contract for the purchase of property, made in this State during the recent war, Chief Justice CHASE said, in *Thorington* v. *Smith* (8 Wall. 1), in reasoning which appears to us unanswerable, that parol evidence could be received, to show that a contract in writing, made and payable in Alabama during the war, in " dollars," was in fact made for a payment in Confederate currency, or Confederate " dollars."

The special pleas, averring the verbal agreement to accept in payment Confederate currency, do not, in the view we have taken, propose to vary the legal effect of the promissory note on which the suit is founded. They aver only facts, enabling the court to fix the sense in which the words employed in the contract were used by the parties, and to give effect to their contract, so far as it can lawfully be done.

6. It is argued, however, that the verbal agreement set out in the pleas, was without the authority of the administratrix, and void. However this may be, if the administratrix was called to account by creditors or distributees, or if an administrator *de bonis non* or creditors or distributees were seeking to charge the purchasers for a conversion of the property purchased, the administratrix is estopped in this suit, from denying her want of authority to make the agreement. An unbroken current of decisions in this court establishes this proposition. As we have said, an unauthorized sale of personalty by an administrator passes no title to the purchaser, because without the authority of the administrator, and prohibited by law. Yet, the administrator making the sale is estopped from recovering of the purchaser the property sold. He is not heard to found a complaint on his excess of authority and violation of duty. *Pistole* v. *Street*, 5 Port. 64; *Fambro* v. *Gantt*, 12 Ala. 298 ; *Swink* v. *Snodgrass*, 17 Ala. 653. In the case of *Farrow* v. *Bragg* (30 Ala. 261), a special administrator made a contract for the hiring of slaves, the property of the intestate. He sued the hirer for the recovery of hire, and the suit was revived and continued in the name of an administrator in chief subsequently appointed. To avoid the contract of hiring made by the special administrator, it was alleged to be in excess of his authority. This court said : " The answer to this is, that Adair (the special administrator) cannot set up his own want of authority. He instituted the present suit, and it is only continued in the name of the administrator in chief. He is estopped from denying his own authority to make the contract." In *Stoudenmeier* v. *Williamson* (29 Ala. 558), an administrator made a warranty of the soundness of personal property,

[Riddle v. Hill's Administrator.]

sold by him. The warranty was unauthorized, was an excess of his authority, but was declared binding on him personally. It is certainly true, that on a sale made by an administrator, the maxim *caveat emptor* applied in its fullest force. The purchaser risks the soundness and title of personal property; yet it is well settled, that if the administrator makes a fraudulent representation, or a false warranty of soundness, it may be set up as a defence to an action for the recovery of the purchase-money. *Rice* v. *Richardson*, 3 Ala. 428; *Craddock* v. *Stewart*, 6 Ala. 77; *Atwood* v. *Wright*, 29 Ala. 346.

It may be safely affirmed, as a general rule, that no trustee is permitted to avoid his acts or contracts, because they may be a breach of trust, an excess or abuse of the authority with which he is invested. The books abound with cases in which he has parted with trust funds in payment of his own debts, or made unauthorized alienations of the trust estate; and though the *cestuis que trust* can pursue the funds into the hands of the party receiving them, or recover the estate aliened without authority, no case can be found, in which the trustee has been permitted to repudiate his own act. The right of repudiation does not belong to him. It pertains to the *cestuis que trust* alone, as a shield of protection. Agents often make contracts in excess of their authority; yet, they have never been permitted to avoid the liability the contract may impose. If the principal seeks the enforcement of the contract, he ratifies it in its entirety, — assuming its burdens, as well as reaping its benefits. And in this case, if the parol agreement set out in the pleas was made, it inheres to the contract, and whoever claims its enforcement must take it *cum onere*. The pleas, pursuing the carefully considered case of *Herbert & Gessler* v. *Easton* (43 Ala. 547), admit the value of the property as the measure of recovery. The court erred in sustaining the demurrers to them.

The case of *Hill* v. *Erwin* (44 Ala. 661) is in conflict with this opinion, and, after deliberate consideration, is overruled.

The rulings of the circuit court were not in accordance with our views; and the judgment is reversed, and the cause remanded.

PETERS, C. J. — I concur, very reluctantly, in the reversal, but not in the reasons of the opinion of the court sustaining this result. I am unwilling to pledge myself to the principle, that an *administrator* has power to dispose of the property of the deceased, except by sale for some legal tender currency, or for specie. I do not recognize the principle settled in *Thorington* v. *Smith* as authorizing such a sale as the one set up here.