169 So. 13

**HOUSTON COUNTY et al. v. MARTIN.**

4 Div. 869.

Supreme Court of Alabama.

June 11, 1936.

W. Perry Calhoun and L. A. Farmer, both of Dothan, Geo. A. Sossaman, of Mobile, and Merrill, Jones & Whiteside, of Anniston, for appellants.

E. W. Pettus, of Selma, Ernest Matthews, of Birmingham, W. L. Lee, of Dothan, and Niel P. Sterne, of Anniston, for appellee.

BROWN, Justice.

This appeal is from a declaratory judgment rendered on the petition of appellee, contested by appellants, adjudging that the fees collected by the appellee, as judge of probate of Houston county, for official services, authorized by section 7285 of the Code 1923, from September 1, 1933, to January 14, 1935, though the fees so collected exceeded the sum of $6,000 per annum, were the property of the appellee, and that the appellants were without right or interest therein.

The proceedings and the appeal are authorized by the Uniform Declaratory Judgment Act. Gen. Acts 1935, p. 777. And the pleadings present a bona fide con-

troversy. Jefferson County v. Johnson, ante, p. 406, 168 So. 450.

The contention of the appellants, asserted in the circuit court and here renewed, is that what is termed in brief and in the record as the "Sparks Amendment" (Const.1901, Amend.No.26A, see Gen.Acts 1933, Ex.Sess., p. 46), but more appropriately designated in the 1936 Supplement to Michie's Code, Annotated, "Suspension of Restriction on Diminishing Public Salaries, etc.," is self-executing and ex proprio vigore limited the right of appellee to collect and appropriate to his own use such fees to the amount of $6,000 per annum, and all fees collected by him in excess of $6,000 become property of the county, and appellee is chargeable therewith as a trustee in invitum; that the "Hendley Act," approved September 9, 1935 (Gen. Acts 1935, pp. 844–846), imposed on the appellee the duty to account for such excess, under penalty, and makes a failure to so account an indictable offense.

The contention of appellee, on the other hand, is that said amendment, in so far as it fixes the maximum compensation of $6,000 is indefinite and uncertain whether the allowance was intended to be gross or net, makes no provision for office assistance, and therefore cannot be applied to officers who derive their compensation solely from fees fixed by law for their official services, without additional legislation, and until such legislation is or was enacted the title to all fees collected by the appellee vested in him as his sole property; that the said "Hendley Act" (Gen.Acts 1935, pp. 844–846) is also so indefinite that it cannot be enforced without further legislation; that it is retroactive in its operation and subjects officers who do not account to civil penalties and criminal indictment, and is therefore ex post facto and violative of section 22 of the Declaration of Rights.

In disposing of these questions we shall assume that said "amendment" or "suspension" of the provisions of the Constitution protecting compensation of constitutional officers from reduction was validly proposed and adopted as a part of the Constitution— that question not being presented on this record.

■ However, we do not wish to be understood as holding that the right to amend the Constitution reserved to the people by section 284 of the Constitution, as amended by Const.1901, Amend.No. 24, includes the right of a majority to temporarily suspend the Constitution or any part thereof to meet a real or fancied emergency. If three-fifths of the members elected to the House and Senate, with the approval of a majority of the electorate voting in an election, can temporarily suspend the provisions of the Constitution protecting public salaries from reduction—provisions intended to secure to the people of the state a virile, independent, and just government of law—then by like procedure the provisions of the Constitution protecting freedom of speech and freedom of the press may also be *temporarily* suspended. Or, the provisions of the Constitution securing to the citizen civil liberty, the right to the writ of habeas corpus, the right to public trial before an impartial tribunal, the right of trial by jury, may also be suspended for a certain time, during which those in authority may arrogate to themselves the right and power to punish summarily those who find fault with or who are not in accord with the existing regime. By the same practice, if finally approved by the courts, every right and immunity protected by the Declaration of Rights may be suspended to meet the will of the majority, substituting a government of men for a government of law. No such thought was ever entertained by the framers of the Constitution or the people in its adoption, and no such practice has ever been attempted in any sovereignty on earth existing under a written Constitution, except in Alabama.

"A constitution, unlike a statute, is intended not merely to meet existing conditions, but to govern the future. It has been said that the term 'constitution' implies an instrument of a permanent nature." 6 R.C. L. pp. 16, 17, § 3.

■ Constitutions are not primarily designed to protect majorities who are usually able to protect themselves, but to preserve and protect the rights of individuals and minorities against the arbitrary actions of those in authority. State v. Bush, 12 Ala. App. 309, 68 So. 492.

It is only through a permanent and stable government of law that justice may be established and administered, and the blessings of liberty secured to the people and their posterity. This is so, notwithstanding the reserved political power "inherent in the people," and the fact recognized by the Constitution, that "All free governments are founded on their authority, and instituted for their benefit; and that, therefore, they have at all times an inalienable and indefeasible right to change their form of government in such manner as they may deem expedient." Const.1901, § 2.

514

That principle has found full expression in this language: "Under our institutions sovereignty resides in or with the people, and may be exercised in the manner *they have provided in their constitution.*" (Italics supplied.) 6 R.C.L. p. 24, § 13.

The representatives of the people in convention assembled, who framed the Constitution, contemplated neither revolution nor repudiation. The Constitution itself provides the only method of changing the form of government which it sets up and establishes—by a convention of the representatives of the people. Const. 1901, §§ 284–287; Collier, Governor, v. Frierson et al., 24 Ala. 100; Johnson v. Craft et al., 205 Ala. 386, 87 So. 375; Realty Investment Co. v. City of Mobile, 181 Ala. 184, 61 So. 248; In re Opinions of the Justices (In re Proposed Amendment to Constitution Authorizing Issuance of Interest-Bearing Warrants and Levy of Income Tax), 223 Ala. 365, 136 So. 585.

■ It is well settled that even a state of war and the declaration of secession by the people cannot suspend the Constitution or remove its protection; and the mature judgment of the courts, after the strife was ended, was that the Constitution prevailed and the judgments and decrees of the courts of Alabama, rendered during the War between the states, were valid and binding. Riddle et al. v. Hill's Administrator, 51 Ala. 224; Horn v. Lockhart et al., 17 Wall. 570, 21 L.Ed. 657; 6 R.C.L. p. 41, § 35; United States v. L. Cohen Grocery Co., 255 U.S. 81, 41 S. Ct. 298, 65 L.Ed. 516, 14 A.L.R. 1045.

■ It is a well-settled rule of interpretation, applicable to constitutions as well as statutes, that it is permissible in ascertaining their purpose and intent to look to the history of the times, the existing order of things, the state of the law when the instrument was adopted, and the conditions necessitating such adoption. Fox v. McDonald, 101 Ala. 51, 13 So. 416, 21 L.R.A. 529, 46 Am.St.Rep. 98; 16 R.C.L. p. 51, § 46.

■ It is now a matter of history, known to all men, that prior to the Extra Session of the Legislature at which said "Sparks Amendment" was proposed, the Governor and the Legislature had been elected after an "anti-tax levying campaign"; that the current debts of the state had increased; the Governor, in order to keep the schools open, had procured a large loan, much in excess of what the Constitution authorized, and the state treasury was facing a large deficit—about $16,000,000. The Legislature had, at the Extra Session of 1932, passed the Fletcher-Bonner Bill, making a drastic reduction in salaries of state officials and employees above $1,200, (of from 33⅓ to 5 per cent. As to officers and employees whose salaries were not protected from reduction by sections 150 and 281 of the Constitution, the act was made effective on the last day of the month in which it was passed and approved. As to those whose salaries were protected, it was made to take effect at the end of their terms, and regulated the salaries of their successors, excepting the Justices of the Supreme Court, and as to them it was effective at the end of the terms of the two last elected before the passage of the act. Gen.Acts 1932, Ex.Sess., pp. 300, 301.

House Bill No. 1, introduced at the Special Session of 1933 (January 31, 1933), proposed the following as article 24 of the Constitution: "All provisions of the Constitution which prohibit the Legislature from reducing, decreasing, or diminishing the salary, fees, or compensation of any executive, legislative, or judicial officer, whether elected or appointed, of this State, or any sub-division thereof, during the term for which he shall have been elected or appointed, *are hereby suspended* until October 1, 1935. Until October 1, 1935, the Legislature shall have the power and authority to reduce the salary, fees, or compensation of any officer during his term of office. Any law heretofore adopted by the Legislature reducing the salary, fees, or compensation of any office, effective by its terms, after the expiration of the present term of such office, shall, by virtue hereof, be effective during the current term of the office affected from and after the first day of the month next succeeding the date of ratification of this amendment." House Journal, Ex.Sess.1933, p. 43. (Italics supplied.)

The bill proposing this amendment was read on the 1st, 2d, and 4th legislative days in the House and passed. It was sent to the Senate on the 5th day, was read on the 6th, and ordered passed over on the 7th. On the 8th a substitute therefor was offered, and the substitute ordered printed. On the 16th legislative day the substitute was amended inserting in its body the following: "Provided that from and after the first day of the month next

succeeding the date of the ratification and adoption of this amendment no salary, compensation, fees or commissions paid to any officer under the State or any County or Municipality thereof, shall exceed the sum of Six Thousand Dollars per annum. *Said limitation of $6000.00 to be inoperative after October 1, 1935.*" (Italics supplied.) Gen.Acts Ex.Sess.1933, p. 47.

The substituted bill was then adopted by the Senate and reported to the House, where it was concurred in by the House on the 17th legislative day. The substituted bill as amended is the published act. Gen.Acts Ex.Sess.1933, pp. 46–48.

In the light of this legislative history and the attendant circumstances, it is clear that the dominant thought in the promulgation of this alleged amendment was to avoid further tax levies by reducing the salaries of state officials and employees and reduce the threat of deficit in the state treasury. Said proviso was written into said amendment primarily as a limitation on the power of the Legislature to fix any salary above the specified amount while said amendment continued in force. The Legislature was not specially concerned with compensation of officers who received fees paid by private individuals for official services. If future legislation had not been contemplated, some provision, no doubt, would have been made in the amendment itself for office assistants, clerks, and for such officers as judges of probate, and disposing of the surplus by requiring it to be paid either into the state or county treasury.

The language which immediately follows said proviso, "Any Act of the Legislature heretofore adopted decreasing or diminishing the salary, fees or compensation of any such officer or officers, and which by its terms is to become effective after the expiration of the present term of any such officer or officers, shall, by virtue hereof, become effective from and after the first day of the month next succeeding the date of the ratification and adoption of this amendment; *Provided, however, that should the Legislature adopt any other Act or Acts decreasing or diminishing the salary, fees or compensation of any such officer or officers during the term for which such officer or officers may have been elected or appointed in a larger amount, such subsequent Act or Acts shall control. Any other Act of the Legislature adopted prior to October 1, 1935 decreasing or diminishing the salary, fees or compensation of any such officer or officers, during the term for which such officer or officers may have been elected or appointed, shall be effective from and after the first day of the month next succeeding· the date of the ratification and adoption of this amendment, or from and after the adoption by the Legislature of any such Act decreasing or diminishing the salary, fees or compensation of such officer or officers,*" is conclusive that further legislation was contemplated, and if such further legislation was enacted before the adoption of the amendment, it should be effective "from and after the first day of the month next succeeding the date of the ratification and adoption of this amendment." If it was enacted subsequent to the adoption of the amendment, "from and after the adoption by the Legislature of any such Act." (Italics supplied.) Gen.Acts. Ex.Sess.1933, p. 47.

As appears from the legislative journals, such legislation was not only pending during the consideration of the bill proposing the amendment, but other bills were offered after said bill was finally passed, and the Lapsley-Lusk Act (Gen. Acts 1933, Ex.Sess., p. 124) was passed during the closing hours of the session. All such legislation was directed at the reduction of salaries of state officers · and employees, and the departments or agencies thereof, and most of it to such salaries as were payable out of the state treasury.

Though it be conceded that the limitation as to the amount of salary or compensation is self-executing as to salaries and compensation payable in fixed sums or commissions from public revenues derived from taxation, the judgment here is it was not applicable to fees fixed by law and payable by individuals for official services, which, under the existing order, became the private property of the individual officer to whom they were paid; and when the status of such fees became fixed as private property, the Legislature was without power to divest the title thereof. Brandon, Auditor, v. Williams, Judge, 166 Ala. 72, 51 So. 873; Fisk v. Jefferson Police Jury, 116 U.S. 131, 6 S.Ct. 329, 29 L. Ed. 587.

The Hendley Act (Gen.Acts 1935, p. 844), as heretofore noted, undertook to fix a penalty on officers, and clerks who do not account, and make their failure or refusal to do so an indictable offense; therefore, if it be construed as applying to

the case of appellee, it is ex post facto and violates section 22 of the Constitution of 1901.

■ Moreover, the provisions of the Hendley Act, like those of the amendment which do not fix a definite standard as to office expenses, clerk hire, etc., are too indefinite to be applied by the courts to officers who are compensated by fees, and required by law to pay for their own assistance. Code, § 9591, subsec. 6; United States v. L. Cohen Grocery Co., 255 U. S. 81, 41 S.Ct. 298, 65 L.Ed. 516, 14 A. L.R. 1045.

The judgment and conclusion of the circuit court are in accord with the foregoing views, and no error appearing, the judgment of said court is affirmed.

Affirmed.

ANDERSON, C. J., and THOMAS, J., concur.

GARDNER, FOSTER, and KNIGHT, JJ., concur in the conclusion.

BOULDIN, Justice (dissenting).

A few things would seem to be fundamental in our institutions. Among them the following:

1st. "That all political power is inherent in the people, and all free governments are founded on their authority, and instituted for their benefit; and that, therefore, they have at all times an inalienable and indefeasible right to change their form of government in such manner as they may deem expedient." Section 2, Declaration of Rights, Constitution of Alabama 1901.

2d. In the absence of constitutional restrictions, the plenary legislative powers vested by the Constitution in the Legislature included the power to fix the salaries and compensation of public officers, and to increase or decrease same at any time as the Legislature should determine. Even as to a constitutional office, this court, through Chief Justice Brickell, declared: "The office, unlike the offices known to the common law, which, lying in grant, were deemed incorporeal hereditaments, has in it no element of property. It is not alienable or inheritable. It is a personal public trust, created for the benefit of the State, and not for the benefit of the individual who may happen to be its incumbent. The measure of his compensation is properly submitted to the legislative power, to be determined in view of the condition of the State, and the necessity for and importance of the discharge of the duties of the office. These will vary from time to time, and will demand as they vary a diminution or enlargement of the compensation. Whoever accepts the office, if he accepts it for the compensation only, has full knowledge of the power of the legislature, and no cause of complaint if they exercise it. He accepted voluntarily, and can voluntarily resign if the compensation is not adequate." Ex parte Lambert, 52 Ala. 79, 82.

Section 281 and kindred sections protecting salaries from legislative interference during the term are limitations on the powers of the Legislature. The same Constitution expressly reserved the inalienable right to amend the Constitution. The power to amend included sections 68, 150, and 281 the same as any other sections. This includes the power to determine what the amendment should be; the power to strike out such sections altogether, or strike them out for a limited time to meet special and temporary conditions. To my mind these propositions are so manifest that to state them is all the argument needed.

Article 24 of our Constitution (Amend. No. 26A), the Sparks Amendment, expressly ordains: *"that from and after the first day of the month next succeeding the date of the ratification and adoption of this amendment no salary, compensation, fees or commissions paid to any officer under the State or any County or Municipality thereof, shall exceed the sum of Six Thousand Dollars per annum. Said limitation of $6000.00 to be inoperative after October 1, 1935."* (Italics supplied.) See General and Local Acts, Extra Session 1933, pp. 46, 47, 48.

The entire thought and purpose of this amendment was retrenchment for the time specifically stated. It fixed the date when it should become operative and the date it should end.

By express terms this provision as to time applies to county as well as to state officers; applies to county officers compensated in whole or in part from fees, as well as "commissions," either out of public funds or fees paid by individuals for official services.

We must keep in mind this amendment was submitted to and was made the law by

the people of the state. No reason is apparent why the Legislature, in proposing the amendment, should have intended one thing and said another; should have so framed it as to become a mere idle gesture as affecting judges of probate. Courts should not impute any such intention.

But if such were true, what did the voters of Alabama say when they ratified it? They said no judge of probate in Alabama during the period named should be compensated from fees or otherwise exceeding $6,000 per annum.

The express and unambiguous wording of the amendment leaves no room for construction. The purpose to include county officers, both in the maximum fixed and the time it was to begin and to end, is just as clear and unequivocal as to state officers.

If we seek for reasons behind such provision, we may well suppose the fitness of things suggested that county officers should not continue to receive compensation for services in excess of that received by the highest executive and judicial officers of the state. Retrenchment in county affairs as well as state affairs was a subject of consideration by that Legislature.

County officers generally draw on the county treasury for substantial sums. Especially is this true as to the judge of probate, who draws from the public funds, not only ex officio fees in the usual sense, but express fees for specific services. Moreover, the fees paid by individual citizens under the fee system constitute a law-imposed burden for governmental purposes; compensation of public officers for official services. They are in lieu of taxation in the usual form.

By a uniform course of legislation, and constitutional reform, when officers have been put on salaries, these fees have been continued to be collected for the public treasuries. Witness the clerk of the Supreme Court, circuit solicitors, counties with constitutional salary amendments, etc.

The intent of the amendment is, I think, not in doubt at all.

The only question of difficulty is whether it can be given force according to its intent because of omissiveness or want of legislation necessary to its administration.

Needless to say every sound rule of construction demands that constitutional provisions shall not fail in the accomplishment of their full purpose, if by any reasonable construction such result can be avoided.

The chief, if not the only, difficulty in applying this amendment to fee officers is administrative in character.

No one questions that the compensation of $6,000 means compensation to the officer for his services; does not contemplate that out of same he shall pay for all the clerical help and other expense of his office. Legislators certainly knew that such expenses varied greatly in the several counties; indeed, might outrun $6,000 in larger counties. Reasonable expenses, the same, for instance, as he was theretofore paying out of his own pocket, or such higher or lower sums as were paid out in good faith during this period, are a proper charge on funds received. But the express terms of this amendment, from the day it became law, told every judge of probate that all fees received above his compensation at the rate of $6,000 per year, and the proper expenses of his office, were not his own, but held in trust.

But, it is said, the beneficiary of the trust is not named, nor is there any one named with whom he may settle and get an acquittance.

That they were public funds held in trust he had every reason to know.

Courts of equity have been known to construe and define trusts at the instance of trustees when in doubt. Certainly they afford a remedy for accounting and settlement of trusts.

I am not convinced that any judge of probate could not have found a way to account for and pay over the surplus in his hands had he so desired, even without legislation. But I think he was under no duty to do so here because the Hendley Act provided the necessary administrative machinery for settling the trust.

The amendment, by its terms, was to cover a period of little more than two years. Before that period expired, the Legislature would again be in session.

I can see nothing impossible, legally nor practically, in allowing the judges of probate to go on their way unmolested, collecting and keeping account of fees as the law required, knowing that any surplus so collected, after a proper accounting, was held in trust, followed by an act before the expiration of the period cover-

ed by the amendment looking to an accounting and paying over the trust funds as directed by such act.

So construed, section 3 of the Hendley Act has none of the features of an ex post facto law. The misdemeanor declared is for a future violation of the act itself. I do not agree to the proposition that an absolute title to all these fees vested in the judge of probate as received, with the right to dispose of same at will. The amendment expressly negatives such notion.

I therefore dissent from the majority opinion.