MURDOCK, Justice.
On December 30, 2008, Governor Bob Riley issued Executive Order No. 44 creating the Governor’s Task Force on Illegal Gambling (“the Task Force”). The order stated that the purpose of the Task Force was “promoting and supporting uniform statewide enforcement of Alabama’s anti-gambling laws and to carry out the Alabama Constitution’s strong public policy against lottery schemes and illegal gambling.” The order created a special prosecutor to serve as the commander of the Task Force, who, in that capacity, is empowered to “have statewide jurisdiction” to “conduct investigations, attend any regular, adjourned or special session of any circuit court ... for the investigation of or the prosecution of any criminal case or the prosecution or defense of any case related to gambling activity in the State of Alabama.” Governor Riley appointed former Jefferson County District Attorney David Barber as Task Force commander.
Cornerstone Community Outreach, Inc. (“Cornerstone”), obtained a license from the Town of White Hall in Lowndes County to operate a bingo-gaming facility, which is known as the White Hall Entertainment Center (“the EC”). An LCD screen outside the EC advertises that the EC offers “HOT SLOTS!” for its customers. The EC contains several hundred electronic gaming machines that are played by hundreds of customers every day. Cornerstone purportedly obtained its license so that it could operate charity bingo games in accordance with Amendment No. 674, Ala. Const. 1901 (Local Amendments, Lowndes County, § 3, Ala. Const. 1901 (Off.Recomp.)).
Pursuant to its mandate, the Task Force on March 19, 2009, executed a search warrant on the EC and confiscated approximately 105 electronic gaming machines,[1] the servers to which those machines were attached, over $500,000 in proceeds from *69 the games played at the EC, and various records kept by Cornerstone. In the early afternoon on March 19, 2009, Cornerstone filed an action in the Lowndes Circuit Court against Governor Riley, in his official capacity, Barber, in his official capacity as the Task Force commander, and certain other members of the Task Force in their official capacities (collectively “the Riley defendants”)-[2] Cornerstone sought, among other things, a declaratory judgment and preliminary and permanent in-junctive relief regarding the seizure of the electronic gaming machines by the Task Force. Specifically, Cornerstone requested a judgment declaring that its bingo operation at the EC is permitted under Amendment No. 674, Ala. Const.1901,[3] and whether the electronic gaming machines seized by the Task Force constitute illegal “slot machines” under § 13A-12-27, Ala. Code 1975. Cornerstone requested a preliminary injunction restraining the Task Force from any further interference with its operation at the EC during the pen-dency of this action and directing the Task Force to return all the seized machines, servers, and records based on its belief that the machines are legal under Alabama law.
Freedom Trail Ventures, Ltd. (“FTV”), subsequently filed a motion to intervene in the action, alleging that it owned at least some of the machines seized by the Task Force and that it had leased those machines to Cornerstone. The trial court granted FTVs motion for the limited purpose of allowing it to participate in the prehminary-injunetion phase of the proceeding.
Shortly after the seizure of property at the EC, the trial court held a conference call with the parties’ attorneys to schedule a hearing on the motion for a preliminary injunction. Because the Task Force’s action caused Cornerstone to shut down its operation at the EC, Cornerstone requested that the hearing be held immediately. On behalf of the Task Force and Governor Riley, Barber requested that the defendants be given a week to prepare for the hearing. Cornerstone stated that it would agree to Barber’s timetable if, in the meantime, it would be permitted to continue its operations at the EC without the threat of another raid by the Task Force during the pendency of this action. The Task Force refused to agree that it would refrain from re-raiding the EC, and thus the trial court set the hearing for two days after the conference call.
During a two-day preliminary-injunction hearing, the trial court heard testimony from the members of the Task Force who had executed the search warrant, from the Task Force’s slot-machine expert, Daryl Robert Sertell, and from Cornerstone and FTVs gambling expert, Joseph Valandra. Following the hearing, the trial court entered an order granting Cornerstone and FTVs request for a preliminary injunction, ordering the Riley defendants to return all property seized during the March 19, 2009, raid, and ordering them to refrain from interfering with Cornerstone’s operation at the EC during the pendency of this action.
On March 30, 2009, Governor Riley (case no. 1080806) and the members of the Task Force (case no. 1080805) appealed the trial court’s issuance of the preliminary injunc *70 tion. In addition, they requested, and on April 17, 2009, this Court granted, a stay of the preliminary injunction pending this Court’s determination of these appeals.
On April 21, 2009, the Task Force instituted a civil-forfeiture proceeding in the Lowndes Circuit Court seeking forfeiture of all items seized during the March 19, 2009, raid on the EC.
On May 26, 2009, the Riley defendants filed their appellants’ brief on the merits of their appeals of the trial court’s preliminary injunction. On May 29, 2009, Cornerstone and FTV filed in both appeals a motion asking this Court to dissolve the preliminary injunction and to dismiss the appeals.[4] In the motions to dismiss, Cornerstone and FTV alleged that the Task Force’s filing of the civil-forfeiture action, along with the fact that the Task Force had not further interfered with Cornerstone’s operation at the EC, rendered the preliminary injunction unnecessary and the appeals moot. The Riley defendants filed a response in opposition to the motions to dismiss the appeals, contending that the civil-forfeiture action does not moot the instant appeals and urging the Court to decide the issues presented by the trial court’s issuance of the preliminary injunction. Since these filings, Cornerstone and FTV have filed their appellees’ brief regarding the merits of the appeals from the preliminary injunction, and the Riley defendants have filed their reply brief.

Mootness

We first consider whether the matter before us is moot. It has been held that “ ‘a case is moot when the issues *71 presented are no longer “live” or the parties lack a legally cognizable interest in the outcome.’” County of Los Angeles v. Davis, 440 U.S. 625, 631, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979) (quoting Powell v. McCormack, 395 U.S. 486, 496, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969)). Expanding on this definition, this Court has said that
“ ‘[t]he test for mootness is commonly stated as whether the court’s action on the merits would affect the rights of the parties.’ Crawford v. State, 153 S.W.3d 497, 501 (Tex.App.2004) (citing VE Corp. v. Ernst & Young, 860 S.W.2d 83, 84 (Tex.1993)). ‘A case becomes moot if at any stage there ceases to be an actual controversy between the parties.’ Id. ... (citing National Collegiate Athletic Ass’n v. Jones, 1 S.W.3d 83, 86 (Tex.1999)).”
Chapman v. Gooden, 974 So.2d 972, 983 (Ala.2007) (emphasis omitted; emphasis added).[5]
When one party sues another in an effort to obtain declaratory or injunc-tive relief contending that the other party’s conduct is wrongful, a showing of “voluntary cessation” of the challenged conduct can moot the action. Demonstrating that the action should be deemed moot on this basis, however, is not an easy burden.
“Voluntary cessation of challenged conduct moots a case ... only if it is ‘absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.’ United States v. Concentrated Phosphate Export Assn., Inc., 393 U.S. 199, 203 (1968) (emphasis added). And the ‘ “heavy burden of ’ per-suafding]” the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness.’ Friends of Earth, [Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,] 528 U.S. 167, 189 (2000) (emphasis added).”
Adarand Constructors, Inc. v. Slater, 528 U.S. 216, 222, 120 S.Ct. 722, 145 L.Ed.2d 650 (2000). As the United States Supreme Court stated earlier in United States v. W.T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953), a “case may nevertheless be moot if the defendant can demonstrate that ‘there is no reasonable expectation that the wrong will be repeated.’ ” (emphasis added; quoting United States v. Aluminum Co. of America, 148 F.2d 416, 448 (2d Cir.1945)).
The facts of this case are not those of the ordinary voluntary-cessation situation because here the party volunteering to cease some activity is not the party whose activity is challenged in the underlying action. In other words, in the ordinary voluntary-cessation situation, it is the activity challenged in the underlying action that a party volunteers to cease, thereby making the case moot. Here, the activity challenged in the underlying action is the seizure and retention of the electronic gaming machines and related property by the Task Force, as well as the prospect of further interference by the Task Force with the operation of the EC. Cornerstone and FTV asked for and obtained a preliminary injunction against this activity. The *72 Task Force is not agreeing to cease any activity.
The question then becomes whether Cornerstone’s willingness to cease certain of its activities makes appellate review of the preliminary injunction entered by the trial court moot. In one sense, Cornerstone and FTV have agreed voluntarily to cease any effort to possess and use the particular machines seized by the Task Force pending a trial on the merits.
Even assuming for present purposes that Cornerstone and FTV’s expressed willingness to voluntarily relinquish the possession and cease the use of the machines in question would otherwise provide support for a finding of mootness, such willingness is not adequate for that purpose in the present case. As noted, voluntary cessation of challenged conduct moots a case only if it is “ ‘absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.’ ” Ada-rand Constructors, 528 U.S. at 222, 120 S.Ct. 722 (quoting United States v. Concentrated Phosphate Export Ass’n, 393 U.S. 199, 203, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968)). As the United States Supreme Court explained in W.T. Grant Co., 345 U.S. at 633, 73 S.Ct. 894, the movant’s burden of persuading the court that this standard is met “is a heavy one.” See also Concentrated Phosphate Export Ass’n, 393 U.S. at 203, 89 S.Ct. 361 (stating that “[t]he test for mootness in cases such as this is a stringent one”).
We cannot conclude that Cornerstone and FTV have met their “heavy burden” of showing that it is “absolutely clear that the alleged wrongful behavior could not reasonably be expected to recur.” First, only a small percentage of the machines at the EC were seized; except for a brief interruption after the raid of the EC, Cornerstone never ceased operation of the EC— and continues to operate the EC — using the remainder of its machines. Furthermore, Cornerstone itself has advised this Court that it has already obtained machines to replace those that were seized and since June has engaged in the acts of possessing and using those machines in the same manner in which it used the seized machines. A limitation of the inquiry to only the machines seized by the Task Force, to the exclusion of machines that remain in the possession and use of Cornerstone and, indeed, additional machines that have been specifically procured by Cornerstone for the purpose of replacing the seized machines, would be to read the above-quoted principle from Adarand Constructors more narrowly than is appropriate for purposes of informing a decision as to mootness and, in turn, this Court’s jurisdiction to decide an appeal.
We also consider whether the appeals of the preliminary injunction are or could be made moot if this Court were to remand the case in order to allow for a rescission by the trial court of the preliminary injunction. At bottom, what would then be at issue would not be an agreement by Cornerstone and FTV to relinquish their right to engage in any particular conduct, but rather an acquiescence by Cornerstone and FTV in having the trial court rescind an order favoring them. We are aware of no cases in which a willingness by a prevailing party in the trial court to have the case returned to the trial court for purposes of the rescission of the order favoring it moots the proceeding in the appellate court.
Although the present case concerns a preliminary injunction, its posture is similar in material respects to that of City of Erie v. Pap’s A.M., 529 U.S. 277, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000). Eñe concerned the owner of a nude-dancing establishment in Erie, Pennsylvania. The city passed an ordinance making it an offense *73 to knowingly or intentionally appear in public in a “state of nudity.” Pap’s A.M. operated “Kandyland,” an Erie establishment that violated this ordinance. It sued Erie and the city officials, seeking declaratory relief and a permanent injunction against the enforcement of the ordinance. The case eventually was appealed to the Pennsylvania Supreme Court, which struck down the ordinance as violating Pap’s right to freedom of expression as protected by the First and Fourteenth Amendments to the United States Constitution. The United States Supreme Court granted certiorari review. Pap’s then filed a motion to dismiss the case, along with an affidavit stating that it had “ceased to operate a nude dancing establishment in Erie.” Pap’s argued that the case was therefore moot because “[t]he outcome of this case will have no effect upon [Pap’s].”
The United States Supreme Court concluded that “the case is not moot” and proceeded to the merits. 529 U.S. at 289, 120 S.Ct. 1382. On the question of mootness, the Court reasoned as follows:
“Simply closing Kandyland is not sufficient to render this case moot, however. Pap’s is still incorporated under Pennsylvania law, and it could again decide to operate a nude dancing establishment in Erie.... Moreover, our appraisal of Pap’s affidavit is influenced by Pap’s failure, despite its obligation to the Court, to mention a word about the potential mootness issue in its brief in opposition to the petition for writ of certiorari, which was filed in April 1999, even though, as Justice Sealia points out, Kandyland was closed and that property sold in 1998. Pap’s only raised the issue after this Court granted certiorari.
“In any event, this is not a run of the mill voluntary cessation case. Here it is the plaintiff who, having prevailed below, now seeks to have the case declared moot. And it is the city of Erie that seeks to invoke the federal judicial power to obtain this Court’s review of the Pennsylvania Supreme Court decision. The city has an ongoing injury because it is barred from enforcing the public nudity provisions of its ordinance. If the challenged ordinance is found constitutional, then Erie can enforce it, and the availability of such relief is sufficient to prevent the case from being moot. And Pap’s still has a concrete stake in the outcome of this case because, to the extent Pap’s has an interest in resuming operations, it has an interest in preserving the judgment of the Pennsylvania Supreme Court. Our interest in preventing litigants from attempting to manipulate the Court’s jurisdiction to insulate a favorable decision from review further counsels against a finding of mootness here.”
529 U.S. at 288-89, 120 S.Ct. 1382 (citations omitted).
Unlike the situation in Erie, if Cornerstone and FTV are successful in having the preliminary injunction rescinded by the trial court, there will be no trial court order that would continue to restrict the actions of the Task Force. Nonetheless, the Riley defendants argue that the order, although it will have been rescinded, will be cited as persuasive authority to other trial courts around the State as the issue of the legality of similar electronic gaming machines is litigated in other locales. Although there may be some merit to the Riley defendants’ position in this regard, on balance we find it unpersuasive.
The other factors relied upon in Erie, however, do support a conclusion that this Court should not consider the present proceeding moot. Clearly, as to the questions of law that we must consider in addressing the issue of Cornerstone’s and FTV’s likelihood of success on the merits, both the *74 Riley defendants and Cornerstone and FTV “continue to have” a “concrete stake in the outcome of the case.” 529 U.S. at 288, 120 S.Ct. 1382. Further, in Erie, the Supreme Court found it to be enough that the plaintiff “is still incorporated ... and it could again decide to operate” in the challenged manner. Id. Here, not only is Cornerstone “still incorporated,” but it also has never stopped, and makes no offer to stop, operating in the challenged manner. Further still, the Riley defendants have made no commitment to refrain from any further seizure of machines from the EC, and Cornerstone and FTV have made no commitment to not seek a preliminary injunction against such a seizure. Perhaps most importantly, like the United States Supreme Court in Erie, “[o]ur interest in preventing litigants from attempting to manipulate the Court’s jurisdiction to insulate a favorable decision from review further counsels against a finding of mootness here.” 529 U.S. at 288, 120 S.Ct. 1382.
We decline to hold that the apparent willingness of a prevailing litigant in the court below to have an appeal to this Court dismissed and the case remanded for the purpose of allowing the lower court to rescind the judgment in its favor deprives this Court of any discretion to decide the matter pending before us. Here, one of the movants, Cornerstone, initiated the present action by filing a complaint against various State officials in the Lowndes Circuit Court. It and FTV then sought a preliminary injunction against those State officials. At their request, the trial court convened a hearing in which both sides participated, presenting witnesses and legal arguments. Cornerstone and FTV succeeded in obtaining the relief they had requested. The Riley defendants then sought, as was their right, appellate review by this Court of the trial court’s order for injunctive relief that had been obtained by Cornerstone and FTV. See Rule 4(a)(1)(A), Ala. R.App. P. On April 17, 2009, approximately two and one-half weeks after the filing of the appeals, this Court granted the Riley defendants’ motion to stay the trial court’s preliminary injunction. On May 26, 2009, the Riley defendants filed their brief on the merits of the appeal. Three days later, on May 29, 2009, Cornerstone and FTV then filed their motions seeking the dissolution of the preliminary injunction and the dismissal of the appeals. Since that time, Cornerstone and FTV also have filed their brief on the merits, and the Riley defendants have, in turn, filed them reply brief. These appeals therefore are fully briefed and ready for decision. Given the continuing live controversy between the parties as to the legality of the electronic gaming machines in question, the ongoing activity of Cornerstone in using machines not seized by the Riley defendants, as well as machines procured by Cornerstone in substitution for those which were seized, the concrete interest that both sides clearly continue to have in the legal questions presented in these appeals, including particularly those legal principles that would be addressed in the course of considering Cornerstone and FTV’s likelihood of success on the merits, and the adverseness of the parties relating to these legal questions, we cannot conclude that this Court has no discretion to proceed to consider these appeals.
The observation of the United States Supreme Court in W.T. Grant Co., 345 U.S. at 632, 73 S.Ct. 894,[6] is noteworthy:
*75 “Both sides agree to the abstract proposition that voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not make the case moot. A controversy may remain to be settled in such circumstances, ... e.g., a dispute over the legality of the challenged practices. The defendant is free to return to his old ways. This, together with a public interest in having the legality of the practices settled, militates against a mootness conclusion. For to say that the case has become moot means that the defendant is entitled to a dismissal as a matter of right. The courts have rightly refused to grant defendants such a powerful weapon against public law enforcement.”
(Emphasis added; citations and footnotes omitted.)
Even if the case before us properly could be deemed moot and therefore beyond the power of this Court to decide at this juncture, it would fall within a recognized exception to the doctrine of mootness. We already have discussed the reluctance of federal courts to treat as moot a proceeding involving challenged conduct that is capable of recurring, especially where the public interest is in having the legality of the challenged conduct settled. A similar reluctance informs the exception to mootness that has been recognized in Alabama for issues in which there is great public interest and that are likely to recur.
Specifically, the Riley defendants argue that
“even if this Court concludes that [their] appeal has become moot, it should nonetheless deny the motion [by Cornerstone and FTV to dissolve the preliminary injunction and to dismiss the appeals] under this Court’s ‘exception to the general mootness rule for cases involving a broad public interest.’ Chapman v. Gooden, 974 So.2d 972, 989 (Ala.2007) (internal quotations and citations omitted). That ‘exception exists for a “moot case involving issues of great public importance, which may recur in the future.” ’ Id. (quoting 1A C.J.S. Actions § 81 (2005)).”
As the Riley defendants further note, this Court has explained “ ‘the criteria for applying the public interest exception to the mootness doctrine’ ” as including (1) “the public nature of the question,” (2) “the desirability of an authoritative determination for the purpose of guiding public officers,” and (3) “the likelihood that the question will generally recur.” Riley *76 defendants’ opposition, at 10 (quoting Chapman v. Gooden, 974 So.2d 972, 989 (Ala.2007) (quoting in turn 1A C.J.S. Actions § 81 (2005))), and Graham v. Alabama State Employees’ Ass’n, 991 So.2d 710, 716 (Ala.Civ.App.2007) (applying the public-interest exception to the mootness doctrine). The Riley defendants argue that the present case “falls squarely within the exception” for matters of great public interest. Specifically, the Riley defendants argue with regard to the first criterion, the public nature of the question, as follows:
“First, there is no question that this case ‘involve[s] a matter of public importance.’ Chapman, 974 So.2d at 989. A cursory review of the newspapers of this State demonstrates that the legality of so-called electronic bingo that is played on slot machines is a pressing issue of great public concern spreading all across Alabama.
“The issue is before this Court because Governor Riley and the Task Force have shown that there is no reasonable chance that the machines at issue could.be found to be anything other than slot machines, and no reasonable chance that the computer program used to run them qualifies as the game commonly known as bingo within the meaning of Amendment 674. A ruling by this Court to that effect would surely put a practical end to this latest effort by gambling interests around the State to make a mockery of this State’s gambling laws, and [Cornerstone and FTV] clearly know it. It is for that reason and that reason alone that they seek to avoid this Court’s ruling on that issue. They prefer to delay, continue to rake in millions during the delay with procedural maneuvers such as those they have engaged in here and in other appeals before this Court, and ultimately pin their hopes on the possibility of political changes which they believe may come with delay.”
Riley defendants’ opposition, at 11-12.
Similarly, as to the second criterion, the desirability of an authoritative determination, the Riley defendants argue as follows:
“There is a clear need for ‘an authoritative determination’ of this troubled area of Alabama law ‘for the purpose of guiding public officers.’ [Chapman, 974 So.2d at 989.] Despite this Court’s clear, emphatic, and repeated disapproval of every artful attempt to circumvent Alabama’s anti-gambling law, see, e.g., Barber v. Jefferson County Racing Assoc., 960 So.2d 599, 614 (Ala.2006), gambling interests, as demonstrated by this case, continue to flout those laws.”
Riley defendants’ opposition, at 12.
We need not address all aspects of the Riley defendants’ argument with respect to the first two criteria. It is enough that we agree with the Riley defendants’ contention that the question before us involves a matter of great public interest and importance and that there is a clear and pressing need for an authoritative determination as to that question.
The parties disagree as to whether the fact that this case comes before us in the form of an appeal from a preliminary injunction should counsel against a decision by this Court to decide the issues presented. This case is before us on an appeal of a ruling on a request for a preliminary injunction, as is permitted by Rule 4(a)(1)(A), Ala. R.App. P. This Court has an obligation to decide these appeals, just as it does any appeal properly before it.[7]
*77 Finally, the Riley defendants argue as follows with regard to the third criterion of the public-interest exception: “Third, and perhaps most important, there is a certainty that the questions present here “will generally recur.’ Chapman, 974 So.2d at 989.” Riley defendants’ opposition, at 13. The Riley defendants argue that gambling interests, such as Cornerstone, will continue to operate electronic gaming machines of the nature at issue here, that they are doing so in more and more venues around the State “with each passing day,” and that it is “inevitable that the issues presented here [will] return to this Court and delaying their resolution will not serve the interests of justice.” Riley defendants’ opposition, at 13.
We agree that the legal questions presented here, although presented in the context of an appeal from an order issuing a preliminary injunction, are legal questions of great public interest and importance that are likely to recur and indeed already have recurred in other locales.[8] It is apparent that until such time as this Court addresses the matter, uncertainty and conflicting outcomes will continue.
We therefore proceed to decide the present appeals.[9]

Standard of Review

“The decision to grant or to deny a preliminary injunction is within the trial court’s sound discretion. In reviewing an order granting a preliminary injunction, the Court determines whether the trial court exceeded that discretion.” SouthTrust Bank of Alabama, N.A. v. Webb-Stiles Co., 931 So.2d 706, 709 (Ala.2005). As to questions of fact, the ore tenus rule is applicable in preliminary-injunction proceedings. See Water Works & Sewer Bd. of Birmingham v. Inland Lake Invs., LLC, 31 So.3d 686, 689-90 (Ala.2009). As this Court recently noted in *78 Holiday Isle, LLC v. Adkins, 12 So.3d 1173, 1176 (Ala.2008), however,
“[t]o the extent that the trial court’s issuance of a preliminary injunction is grounded only in questions of law based on undisputed facts, our longstanding rule that we review an injunction solely to determine whether the trial court exceeded its discretion should not apply. We find the rule applied by the United State Supreme Court in similar situations to be persuasive: ‘We review the District Court’s legal rulings de novo and its ultimate decision to issue the preliminary injunction for abuse of discretion.’ Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 428, 126 S.Ct. 1211, 163 L.Ed.2d 1017(2006)....”
(Emphasis omitted.)
The plaintiff bears the burden of producing evidence sufficient to support the issuance of a preliminary injunction. Ormco Corp. v. Johns, 869 So.2d 1109, 1113 (Ala.2003). The requirements for a preliminary injunction are well known:
“ ‘Before entering a preliminary injunction, the trial court must be satisfied: (1) that without the injunction the plaintiff will suffer immediate and irreparable injury; (2) that the plaintiff has no adequate remedy at law; (3) that the plaintiff is likely to succeed on the merits of the case; and (4) that the hardship imposed upon the defendant by the injunction would not unreasonably outweigh the benefit to the plaintiff.’ ”
Blount Recycling, LLC v. City of Cullman, 884 So.2d 850, 853 (Ala.2003) (quoting Blaylock v. Cary, 709 So.2d 1128, 1130 (Ala.1997)).

Merits

The Riley defendants argue that the term “bingo” in Amendment No. 674 should be narrowly construed because, they argue, the bingo amendment is an exception to the prohibition on lotteries found in Art. IV, § 65, Ala. Const.1901. Cornerstone and FTV respond by contending that, under a “plain-meaning” reading, Amendment No. 674 does not state that it is an exception to the lottery prohibition, and thus it should not be viewed as such. The fact is, however, that this Court has explicitly stated that “‘“bingo” is a lottery’ ” and that
“ ‘Amendment No. 508 to the Constitution of Alabama [Calhoun County’s bingo amendment] did not repeal Article IV, § 65, of the Constitution of Alabama. Amendment No. 508 simply amended the Constitution of Alabama by allowing the lottery of “bingo” to be operated legally in Calhoun County for prizes or money by certain nonprofit organizations for charitable, educational, or other lawful purposes. The only lottery legalized by the passage and ratification of Amendment No. 508 was and is the lottery of “bingo.” ’ ”
City of Piedmont v. Evans, 642 So.2d 435, 436 (Ala.1994) (quoting and adopting trial court’s order).
The statement in Evans confirmed what the Court explained in Opinion of the Justices No. 373, 795 So.2d 630, 634 (Ala.2001): “Since 1980, Alabama has adopted various constitutional amendments creating exceptions to § 65, specifically allowing the game of bingo under certain circumstances. See Ala. Const., Amendments 386, 387, 413, 440, 506, 508, 542, 549, 550, 565, 569, 599, and 612.” (Emphasis added.) Thus, the bingo amendments are exceptions to the lottery prohibition, and the exception should be narrowly construed. See also Barrett v. State, 705 So.2d 529, 531 (Ala.Crim.App. *79 1996) (discussed infra ).[10]
Further, except where the language of a constitutional provision requires otherwise, we look to the plain and commonly understood meaning of the terms used in that provision to discern its meaning. As this Court stated in State v. Sayre, 118 Ala. 1, 28, 24 So. 89, 92 (1897): “The object of all construction is to ascertain and effectuate the intention of the people in the adoption of the constitution. The intention is collected from the words of the instrument, read and interpreted in the light of its history.” As this Court noted in Houston County v. Martin, 232 Ala. 511, 514, 169 So. 13,16 (1936):
“It is a well-settled rule of interpretation, applicable to constitutions as well as statutes, that it is permissible in ascertaining their purpose and intent to look to the history of the times, the existing order of things, the state of the law when the instrument was adopted, and the conditions necessitating such adoption.”
In District of Columbia v. Heller, — U.S. -, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), the United States Supreme Court explained that
“ ‘[t]he Constitution was written to be understood by the voters; its words and phrases tvere used in their normal and ordinary as distinguished from technical meaning.’ United States v. Sprague, 282 U.S. 716, 731 (1931); see also Gibbons v. Ogden, 9 Wheat. 1, 188 (1824). Normal meaning may of course include an idiomatic meaning, but it excludes secret or technical meanings that would not have been known to ordinary citizens in the founding generation.”
— U.S. at -, 128 S.Ct. at 2788 (emphasis added).
In addition to the foregoing principles, in Jansen v. State ex rel. Downing, 273 Ala. 166, 169, 137 So.2d 47, 49 (1962), this Court stated that “[a]lthough a legislative act cannot change the meaning of a constitutional provision, such act may throw light on its construction and, as a legislative interpretation of a particular provision, it is entitled to much weight.” The Alabama Legislature itself explained what is meant by “the game commonly known as bingo” when it enacted Ala.Code 1975, § 45-8-150(1). In that statute, the legislature defined the term “bingo” for purposes of Ala. Const.1901, Amendment No. 508 (Local Amendments, Calhoun County, § 1, Ala. Const. 1901 (Off.Recomp.)), which legalized “bingo games” in Calhoun County:
“(1) Bingo. The game commonly known as bingo, which is a game of chance played with cards printed with five rows of five squares each. Participants place markers over randomly called numbers on the cards in an attempt to form a preselected pattern such as a horizontal, vertical, or diagonal line, or all four corners. The first participant to form the preselected pattern wins the game. The term ‘bingo’ means any game of bingo of the type described above in which wagers are placed, winners are determined, and prizes or other property is distributed in the presence of all persons placing wagers in that game. The term ‘bingo’ does not refer to any game of chance other than the type of game described in this subdivision.”
Ala.Code 1975, § 45-8-150(1).
In contrast to the use of merely the term “bingo games” in Amendment No. 508 — the same terminology present in Amendment No. 674 at issue here — Ala. *80 Const.1901, Amendment No. 743 (Local Amendments, Greene County, § 1, Ala. Const. 1901 (Off.Recomp.)), legalizes in Greene County a form of bingo that would include an “electronic marking machine” in lieu of a paper card. Even that amendment, which is the only amendment in Alabama we have located that makes any reference to the use of electronic equipment of any form, contemplates a game in all material respects similar to the game of bingo described in § 45-8-150(1), and something that is materially different from the types of electronic gaming machines at issue here. Amendment No. 743 begins by saying that “bingo” is “[t]hat specific kind of game commonly known as bingo.” The definition then explains that bingo is a game “in which prizes are awarded on the basis of designated numbers or symbols on a card or electronic marking machine conforming to numbers or symbols selected at random.” Moreover, the equipment contemplated by Amendment No. 743 for use in a bingo game is entirely different than the equipment at issue here. Specifically, Amendment No. 743 defines “equipment” for the game of bingo as follows:
“The receptacle and numbered objects drawn from it, the master board upon which such objects are placed as drawn, the cards or sheets bearing numbers or other designations to be covered and the objects used to cover them or electronic card marking machines, and the board or signs, however operated, used to announce or display the numbers or designations as they are drawn.”
For purposes of the present case, the Riley defendants do not contend that a “bingo game” must be played only on paper cards, and we, therefore, do not address that issue. What the Riley defendants do argue, however, is that the game at issue here does not contain other telltale elements of bingo such as players manually marking a card of some sort, the possibility of “sleeping a bingo” either by failing to mark a square or failing to call out “bingo!” once a player has a winning board, players seeing and hearing that someone has won the game, and a game that lasts longer than six seconds. In short, as the Riley defendants put it, the machines at issue “have none of the elements of human skill and interaction that are fundamental to the game of bingo.” Riley defendants’ reply brief, at pp. 6-7.
Several authorities cited by the Riley defendants discuss what constitutes the game commonly known as bingo. In Evans, supra, this Court adopted and set out a trial court’s ruling that held that “ ‘ “Instant bingo” does not constitute “bingo” as allowed by Amendment No. 508 of the Constitution of Alabama.’ ” 642 So.2d at 436. Amendment No. 508 (ratified in 1990) contains the same relevant language as Amendment No. 674 in legalizing “[t]he operation of bingo games.” Piedmont had a municipal ordinance, however, that defined both traditional bingo and a game called “instant bingo.” Instant bingo involved
“ 1 “[a] single banded ticket or card each with its face covered to conceal one or more numbers or symbols where one or more cards or tickets in each set has been designated in advance as a winner. Participants at a designated time of play are required to remove the front cover of the Bingo card to determine if that card holder has the required designated numbers or symbols to be declared a winner.” ’ ”
642 So.2d at 436. The trial court, and this Court, concluded in Evans that instant bingo was not the kind of bingo permitted by Amendment No. 508 because it was
“ ‘a separate and distinct type of lottery from the lottery of “bingo.” It does not even fall within the definition of bingo *81 found in Municipal Ordinance No. 413, which defines bingo as:
“ ‘ “That specific kind of game, or enterprise, commonly known as ‘bingo,’ in which prizes are awarded on the basis of designated numbers, or symbols, which are drawn, at random, by the operator of said game and which are placed by the persons playing, or participating in said game, on cards, or sheets of paper, which contain, or set out, numbered spaces, upon which said designated numbers or symbols, may be placed by the persons playing or participating in said game.” ’ ”
642 So.2d at 436-37.
In Barrett v. State, 705 So.2d 529 (Ala.Crim.App.1996), the Court of Criminal Appeals concluded that a game called “U-Pick-Em”[11] was “clearly not the game ‘commonly known as bingo.’ On the contrary, [that court] agree[d] with the statements by an employee of the Palace and also by the appellant himself, when asked by an investigator how to play the game, that the game [was] played ‘like the Florida lottery.’ ” 705 So.2d at 532. In so ruling, the Court of Criminal Appeals first noted that “Amendment No. 508 allows only a narrow exception to the state’s clear public policy against lotteries and the Alabama constitution’s prohibition of lotteries.” 705 So.2d at 531. It then reasoned that “no expression in [the City of Piedmont’s] ordinance [on bingo[12]] can be construed to include anything other than the ordinary game of bingo.” 705 So.2d at 532. In so ruling, the Court of Criminal Appeals implicitly ruled that the type of bingo permitted by Amendment No. 508, and, therefore, presumably by the other amendments with the same wording and effect, was in fact the traditional game of bingo.
Other jurisdictions also discuss what constitutes the game commonly known as bingo. In Citation Bingo, Ltd. v. Otten, 121 N.M. 205, 910 P.2d 281 (1995), the New Mexico Supreme Court observed that New Mexico’s Bingo and Raffle Act permitted licensed organizations to “conduct games of chance commonly known as ‘bingo’ or ‘raffles’ for educational, charitable, *82 patriotic, religious, or public-spirited purposes.” 121 N.M. at 207, 910 P.2d at 283. That Court concluded that a game called “Power Bingo,” which involved the use of electronic devices to play the game, did not constitute the game “commonly known as ‘bingo.’ ” In so ruling, the Otten Court noted:
“Power Bingo does not change the rules of the game, but it does change the method of play. When a letter and number are called, Power Bingo users simply enter the two-digit number into their device using the keypad. For example, if the caller announces ‘B-6,’ Power Bingo users simply press ’06.’ The unit then compares the number entered with each of its currently stored numbers, placing the entered number in memory if there is a match. The unit also compares any pattern formed by all numbers so stored against the pre-es-tablished winning pattern to see if there is a match. If there is, the unit immediately notifies the user. Thus Power Bingo differs from traditional bingo in that players of Power Bingo cannot see the cards they have purchased, need not locate and mark numbers on their cards, and need not visually identify any winning pattern.”
121 N.M. at 206-07, 910 P.2d at 282-83. The Court further contrasted “Power Bingo” with traditional bingo, as follows:
“Before the advent of the Power Bingo unit, the game of bingo was played using only paper or hardboard cards. Each paper card consists of a five-by-five matrix containing twenty-four numbered spaces and a center space marked ‘free.’ Numbers between one and fifteen inclusive appear in the first column, numbers between sixteen and thirty appear in the second column, numbers between thirty-one and forty-five appear in the third column, numbers between forty-six and sixty appear in the fourth column, and finally, numbers between sixty-one and seventy-five appear in the fifth column. Each column is designated by a letter of the word ‘bingo,’ the first column designated as ‘B’ and the fifth column as ‘O.’ During the game, the caller draws from a bin one ping pong ball every twelve to fourteen seconds and announces to the hall the letter and number appearing on that ball. The letter is announced only to aid players in finding the correct column. After the letter and number are announced, each player must check all cards he or she is playing to see if there are any matches. If there are, the player marks each match using an ink dauber. As each mark is made, the player must determine whether it completes a pattern that matches a pre-established winning pattern. If it does, the player must call out ‘bingo’ before the next letter and number are announced.”
121 N.M. at 206, 910 P.2d at 282. See also, e.g., Bingo Bank, Inc. v. Strom, 268 S.C. 498, 501, 234 S.E.2d 881, 883 (1977) (explaining that “[t]he game of bingo is played by the use of a ‘Caller’ who announces, one at a time, numbers drawn at random from a container into which has been placed numbered balls or objects for that purpose”); Fla. Stat. Ann. § 849.0931(l)(a) (“ ‘Bingo game’ means and refers to the activity, commonly known as ‘bingo,’ in which participants pay a sum of money for the use of one or more bingo cards. When the game commences, numbers are drawn by chance, one by one, and announced. The players cover or mark those numbers on the bingo cards which they have purchased until a player receives a given order of numbers in sequence that has been preannounced for that particular game. This player calls out ‘bingo’ and is declared the winner of a predetermined prize.”).
*83 In State ex rel. Stephan v. Parrish, 256 Kan. 746, 887 P.2d 127 (1994), the Kansas Supreme Court was charged with deciding whether “instant bingo” as permitted by an act of the Kansas Legislature constituted the kind of bingo permitted by Art. 15, § 3a, of the Kansas Constitution. Article 15, § 3, provides that “[l]otteries and the sale of lottery tickets are forever prohibited.” At the time Parrish was decided, Art. 15, § 3a, provided:
“Notwithstanding the provisions of section 3 of article 15 of the constitution of the state of Kansas the legislature may regulate, license and tax the operation or conduct of games of ‘bingo,’ as defined by law, by bona fide nonprofit religious, charitable, fraternal, educational and veterans organizations.”[13]
The Kansas Legislature defined “bingo” as follows in K.S.A. 79-4701(a), originally enacted in 1975 as enabling legislation for Art. 15, § 3a:
“ ‘Bingo’ means a game in which each participant must pay a charge and a prize or prizes are awarded to the winner or winners in which each participant receives one or more cards or in which a card or cards are included in a paper game program booklet each of which is marked off into 25 squares arranged in five horizontal rows of five squares each and five vertical rows of five squares each, with each square being designated by number, letter or combination of numbers and letters, and only the center square designated with the word ‘free’ with no two cards being identical, with the players covering squares as the operator of such game announces a number, letter or combination of numbers and letters appearing on an object selected by chance, either manually or mechanically from a receptacle in which have been placed objects bearing numbers, letters or combinations of numbers and letters corresponding to the system used for designating the squares, with the winner of each game being the player or players first properly covering a predetermined and announced pattern of squares upon the card or a card which is included in a paper game program booklet being used by such player or players.”
In 1993, the Kansas Legislature amended K.S.A. 79-4701 to include within the definition of “bingo” what it called “instant bingo.” Specifically, “instant bingo” was defined as
“a game: (1) In which each participant must pay a charge; (2) in which a prize or prizes are awarded to the winner or winners; (3) in which each participant receives one or more disposable tickets which accord a participant an opportunity to win something of value by opening, detaching or otherwise removing a cover from the ticket to reveal a set of numbers, letters, symbols or configurations, or any combination thereof; (4) which is conducted by a licensee under this act; (5) the conduct of which must be in the presence of the participants; and (6) which does not utilize any dice, normal playing cards or slot machines.”
K.S.A. 79-4701(c).
The attorney general of Kansas challenged the constitutionality of K.S.A. 79-4701, as amended, arguing that
“the phrase ‘games of bingo,’ as used in Art. 15, § 3a, cannot be defined by the legislature to include instant bingo. [The State] argues that absent an amendment to the constitution, instant bingo is unconstitutional. In essence, the State’s argument is that instant bingo is not a ‘game of bingo’ as voters *84 thought or intended when adopting Art. 15, § 3a, but instead is another form of lottery, tagged as a ‘game of bingo’ by the legislature, but prohibited under Art. 15, § 3 of the constitution.”
Parrish, 256 Kan. at 751-52, 887 P.2d at 131.
The secretary of the Kansas Department of Revenue was the defendant in the action and contended that
“the specific language of the constitutional amendment ... provides for ‘games of “bingo,” as defined by law.’ She asserts that the plain language of Art. 15, § 3a specifically delegates the power to define ‘games of bingo’ to the legislature. Furthermore, she maintains that the language recognizes that more than one type of bingo game exists by its use of the plural ‘games of bingo.’”
256 Kan. at 752, 887 P.2d at 131. The latter argument is similar to one of the arguments made by Cornerstone and FTV in this case.
The Parrish Court began its discussion by observing that it was undisputed that when the people adopted Art. 15, § 3a, they were not voting for “instant bingo,” but rather “bingo,” much at it was defined in K.S.A. 79-4701(a). The Parrish Court then noted:
“All parties to this appeal readily concede (1) that instant bingo is a lottery under Art. 15, § 3; (2) that except as provided in Art. 15, §§ 3a, 3b, and 3c, all lotteries are prohibited; and (3) to be constitutional, instant bingo must fall within the term ‘games of “bingo,” as defined by law’ contained in Art. 15, § 3a.”[14]
256 Kan. at 754, 887 P.2d at 133. The Parrish Court observed that the so-called “instant bingo” was nothing more than a pull-tab game. Therefore, it considered the issue presented by the case to be: “[W]hether the game of pull tabs, now called instant bingo by the legislature, has sufficient similar characteristics to traditional bingo, now called call bingo, to be considered a game of bingo within Art. 15, § 3a.” 256 Kan. at 755, 887 P.2d at 133.
At the outset, the Parrish Court analyzed the issue by emphasizing that “the overriding prohibition of the Kansas Constitution is that ‘[l]otteries and the sale of lottery tickets are forever prohibited.’ Art. 15, § 3.” 256 Kan. at 755, 887 P.2d at 133. The Kansas Supreme Court quoted from one of its previous cases, in which it had observed:
“‘Although this constitutional provision was undoubtedly borrowed from states previously admitted to statehood, it is apparent that the framers of the constitution of this state conscientiously determined that prohibiting lotteries forever was a method of promoting a sound basis for the welfare and growth of this state. Since its adoption, many efforts have been made by persons and organizations to circumvent this constitutional provision. Such efforts have generally been made for profit, seeking to elicit money from those who cannot refrain from the instinctive weakness of humanity to gamble.
“ ‘This court has steadfastly adhered to the constitutional provision by striking down such efforts....’”
256 Kan. at 755, 887 P.2d at 133 (quoting State v. Nelson, 210 Kan. 439, 444, 502 P.2d 841, 845 (1972)).
*85 The Parrish Court noted that there are several variations of the game of bingo and stated that the defendants attempted to use that fact as evidence that Art. 15, § 3a, was not merely referring to traditional bingo. The Court responded:
“We agree with the Secretary and the Intervenor,[15] and the State does not seriously contend otherwise, that the terms ‘games of bingo’ in Art. 15, § 3a may logically be construed to mean more than the traditional game of bingo familiar to nearly everyone and as originally defined in the Bingo Act. However, we think it is beyond fair dispute that games of bingo which depart from the general understanding of traditional bingo must fall within the same general category of games and have the basic characteristics common to all such games.”
256 Kan. at 756-57, 887 P.2d at 134 (emphasis added).
The Parrish Court reasoned that “[a]s we have no clear precedent to guide us, we are limited to determining whether instant bingo contains enough of the basic elements or characteristics of bingo to be lawfully defined as a game of bingo.” 256 Kan. at 761, 887 P.2d at 136. It proceeded to reject the common characteristics of the game put forth by the intervenor,[16] finding “none of them to be a true characteristic inherent in bingo or similar games.” Id.
The Parrish Court then explained what it believed to be the major characteristics of traditional bingo and contrasted them with the game of “instant bingo” at issue:
“In reviewing the numerous definitions of bingo and bingo-type games submitted by industrious counsel, there are definite characteristics common to and inherent in bingo-type games. All definitions include the requirement of a card or paper utilizing numerous numbers which are to be covered or marked if and when one of the numbers is drawn by lot and announced by a caller or selected through some other similar method. Bingo-type games contemplate a group activity, often social, with several participants. The object of the game is to be the first to complete the pattern prescribed for that particular bingo-type game from the numbers called. Instant bingo utilizes a small pull tab card where the activity may be only one- on one between the player and the seller of the card. As such, it does not have the group participation required of bingo-type games.
“In bingo, each game lasts several minutes with the participants hoping to be the first to complete a winning line on their cards. In instant bingo the result is instantaneous with the pulling open of the tab or tabs which will reveal whether the player has won or lost. The basic elements or characteristics of games of bingo, as generally understood and as defined by knowledgeable authorities, are totally lacking in instant bingo. In fact, instant bingo has characteristics far more similar to slot machines, punchboards, and other forms of gaming rather than to bingo-type games.”
*86 256 Kan. at 761, 887 P.2d at 136-37 (emphasis added). Accordingly, the Kansas Supreme Court concluded:
“While we recognize the broad power of the legislature under Art. 15, § 3a, we are of the opinion that in defining games of bingo such definition must bear a reasonable and recognizable similarity to the many definitions of bingo and other bingo-type games fu/mished by counsel and to the common understanding of the term by the people of Kansas. We conclude that the attempt to define pull tab games as games of bingo fails the necessary test and that the legislature has overstepped its bounds with the enactment of the instant bingo amendments. The definition of instant bingo in K.S.A.1993 Supp. 79-4701(c) exceeds the power granted the legislature to define games of bingo in
Art. 15, § 3a and is unconstitutional.” 256 Kan. at 762, 887 P.2d at 137 (emphasis added). See also Department of Texas Veterans of Foreign Wars of the United States v. Dorning, (CV # 07-S-2144-NE, Sept. 28, 2009) (N.D.Ala.2009) (unreported decision) (citing Barber v. Jefferson County Racing Ass’n, Inc., 960 So.2d 599 (Ala.2007), and agreeing in dictum that “the electronic machines at issue in this case are said to provide only an entertaining means of revealing the results of an electronic bingo game conducted in the inner workings of a computer server”).
Based on the foregoing, we must conclude that the term “bingo” as used in Amendment No. 674 was intended to reference the game commonly or traditionally known as bingo. The characteristics of that game include the following:
1.Each player uses one or more cards with spaces arranged in five columns and five rows, with an alphanumeric or similar designation assigned to each space.
2. Alphanumeric or similar designations are randomly drawn and announced one by one.
3. In order to play, each player must pay attention to the values announced; if one of the values matches a value on one or more of the player’s cards, the player must physically act by marking his or her card accordingly.
4. A player can fail to pay proper attention or to properly mark his or her card, and thereby miss an opportunity to be declared a winner.
5. A player must recognize that his or her card has a “bingo,” i.e., a predetermined pattern of matching values, and in turn announce to the other players and the announcer that this is the case before any other player does so.
6. The game of bingo contemplates a group activity in which multiple players compete against each other to be the first to properly mark a card with the predetermined winning pattern and announce that fact.
Our review of the record in the present case reveals that Cornerstone and FTV failed to introduce substantial evidence from which the trial court reasonably could have concluded that Cornerstone and FTV had a “reasonable likelihood of success” in proving that the electronic gaming machines seized from the EC constituted the game of bingo. Most of the information regarding the manner in which the machines operate was introduced by the Task Force. The police officer who led the raid on the EC actually played some of the electronic gaming machines before the raid. (Cornerstone and FTV did not present a witness who had played the machines.) From the officer’s testimony, it seems the machines operate almost exactly like slot machines. In fact, an entire “bingo game” takes approximately six seconds, *87 involves no numbered cards, and requires no player interaction at all, other than the player initially inserting cash or a “player’s card” with cash credits into the machine and then pressing a button or pulling a handle to find out the outcome. A player learns the outcome through a large display that specifically tells the player whether he or she has won and a smaller display that shows a bingo board and the balls that could have been drawn. A losing player is not told who, if anyone, won the “bingo game.”
The Riley defendants contend that Cornerstone and FTV failed to offer any evidence indicating that the players of the electronic gaming machines know who they are playing against or that they are playing against anyone at all. Cornerstone and FTV counter that “the undisputed evidence was that the machines were linked together, thus allowing for competition between multiple players.” Cornerstone and FTV’s brief, at p. 38 n. 20. It is true that Cornerstone’s expert testified, and the Riley defendants did not dispute, that multiple electronic gaming machines were linked to the same server. The mere fact that the machines may be “linked” in this manner, however, does not demonstrate that players are playing against one another; at most, it leaves open the possibility that it is technologically possible for them to do so.
Cornerstone and FTV rely on the fact that the machines are linked to the same server. The evidence indicates that the server in turn is linked to or uses a computer program that tells the machine being played whether the player of that machine is a winner or loser on that occasion. The outcome is predetermined by the computer program connected to the server. There is no evidence indicating that this “linkage” of individual machines to the server means that the players of the different electronic machines are playing against one another.
On the basis of the foregoing, we cannot conclude that Cornerstone and FTV introduced sufficient evidence from which the trial court could have determined that Cornerstone and FTV had a reasonable likelihood of success on the merits. The trial court’s order issuing a preliminary injunction therefore is reversed, and the cause is remanded for further proceedings consistent with this opinion.
1080805 — REVERSED AND REMANDED.
1080806 — REVERSED AND REMANDED.
STUART, SMITH, BOLIN, PARKER, and SHAW, JJ., concur.
COBB, C.J., and LYONS and WOODALL, JJ., dissent.

. Approximately 850 electronic gaming machines remained at the EC following the execution of the search warrant.

. The other defendants are Emory Folmar, as administrator of the Alabama Beverage Control Board, and Colonel Christopher Murphy, as director of the Department of Public Safety-

. Amendment No. 674 provides, in pertinent part: "The operation of bingo games for prizes or money by nonprofit organizations for charitable, educational or other lawful purposes shall be legal in the Town of White Hall...."

. The motions to dismiss referred to in the text are actually the second such motions filed by Cornerstone and FTV. Cornerstone and FTV also filed motions to dismiss the appeals on the ground that the Riley defendants do not have the authority to appear before this Court in an appeal on behalf of the State. Cornerstone and FTV argue that only the attorney general is authorized to appeal the trial court's ruling. In addition, Attorney General Troy King requested, and was granted permission, to file an amicus brief. In his brief, Attorney General King "takes no issue with" Governor Riley's hiring his own legal counsel or appearing in litigation involving the State, but he urges this Court to “reject the Governor’s argument that he is vested with the authority to appoint attorneys who may name and advance the State’s legal position outside the direction and control of the Attorney General.” See Ala.Code 1975, § 36-15-21 ("All litigation concerning the interest of the state, or any department of the state, shall be under the direction and control of the Attorney General.”).
We note that a question also exists as to Cornerstone’s and FTV's standing to seek a dismissal of the appeals based on their contention as to the relative fields of authority of Attorney General King and the Riley defendants. It is not necessary for us to resolve this issue of standing, however, nor the questions raised by Attorney General King, in light of the fact that Governor Riley is a party to this case, see Ex parte Weaver, 570 So.2d 675, 684 (Ala.1990) (“We recognize that there may be times when the Governor disagrees with the attorney general about matters in litigation. Although we determine that the attorney general is authorized to direct the course of all litigation involving the State and its agencies, the Governor, as 'chief magistrate’ of the State, may intervene in any such litigation. ... As an intervenor, the Governor may express his views and take positions contrary to those argued by the attorney general.” (footnote omitted)), that a judgment had been entered against him, and that he has duly filed an appeal from that judgment. We also note that the record and briefs do not contain or reflect an effort by Attorney General King to instruct the Riley defendants not to appeal from the trial court’s judgment against them, and he specifically does not "seek to intervene as a party” in this case and does not "take a position on the merits of this appeal.”
Given Governor Riley's appeal of the judgment entered against him, and in light of the nature of Attorney General King's position, we need not address further the issues raised by Cornerstone and FTV in their first motions to dismiss.

. "The central issue in any mootness challenge is whether changes in the circumstances existing when the action was filed have forestalled any meaningful relief: '(T)he question is not whether the precise relief sought at the time the application for an injunction was filed is still available. The question is whether there can be any effective relief.' [West v. Secretary of Dept. of Transp. (9th Cir.2000) 206 F.3d 920, 925 (emphasis added; internal quotes omitted)].”
William Schwarzer, A. Wallace Tashima, James Wagstaffe, Practice Guide: Federal Civil Procedure Before Trial, National Edition, "Mootness” Limitation, CH. 2E-3.

. The Court summarized the facts in W.T. Grant Co. as follows:
"For the first time since the enactment of the Clayton Act in 1914 the Court is called upon to consider § 8's prohibitions against interlocking corporate directorates. The Government appeals from judgments dismissing civil actions brought against [John *75 M.] Hancock and three pairs of corporations which he served as a director, W.T. Grant Co. and S.H. Kress & Co., Sears Roebuck & Co. and Bond Stores, Inc., and Kroger Co. and Jewel Tea Co., Inc. Alleging that the size and competitive relationship of each set of companies brought the interlocks within the reach of § 8, the complaints asked the court to order the particular interlocks terminated and to enjoin future violations of § 8 by the individual and corporate defendants. Soon after the complaints were filed, Hancock resigned from the boards of Kress, Kroger and Bond. Disclosing the resignations by affidavit, all of the defendants then moved to dismiss the actions as moot. Treated as motions for summary judgment, they were granted by the District Judge. He concluded that there is not ‘the slightest threat that the defendants will attempt any future activity in violation of § 8 (if they have violated it already).’ "
345 U.S. at 630-31, 73 S.Ct. 894 (footnotes omitted). The Court held that the government failed to carry its burden of showing on appeal that the trial court had abused its discretion in concluding that there was no possibility that Hancock and the companies would attempt to interlock again, though it observed that "[wjere we sitting as a trial court, [the government's] showing might be persuasive.” Id. at 634, 73 S.Ct. 894.

. We further note that, if the trial court knows the legal characteristics of a bingo game, then any further proceedings can focus on whether Cornerstone and FTV have dem *77 onstrated that the electronic gaming machines at issue qualify under the legal definition of the term.

. Based on this Court's records and the briefs submitted in this case, we are aware of litigation concerning the legality of so-called “electronic bingo” machines already pending in, or on appeal to this Court from, five counties, namely: Jefferson, Walker, Lowndes (this case), Etowah, and St. Clair Counties, as well as a decision by the United States District Court for the Northern District of Alabama pertaining to Madison County. Decisions rendered by the trial courts in three of these cases favor the proponents of such machines, while three of them hold that the machines are illegal. None of the six decisions employs exactly the same legal analysis, although the decisions from Jefferson and Walker Counties rely upon several of the same authorities cited in the “merits” discussion below.

. As noted, one of the elements that must be shown in order to obtain a preliminary injunction is "the likelihood of success on the merits." In order to address this element in the present case, we must first ascribe meaning to the term "bingo,” the term that is used in the constitutional amendment at issue here and similar amendments applicable to other locales. It is only against this meaning that we then can measure the facts shown by Cornerstone and FTV at the hearing on the preliminary injunction to determine if Cornerstone and FTV met their factual burden of demonstrating a reasonable likelihood of success on the merits (i.e., demonstrating a reasonable likelihood that the machines have the characteristics of a "bingo game”).
We reject Justice Woodall's assertion in his dissenting opinion that our holding today is somehow not “authoritative.” Under our rules, preliminary injunctions are a proper subject of appeals to this Court, and this Court is obligated to decide such appeals, no less than we are obligated to decide appeals of permanent injunctions. If, in deciding such an appeal, this Court finds it necessary to decide some legal question, our decision as to that legal question is no less authoritative than if that legal question was presented to us in an appeal from a permanent injunction.

. We note that one of the attorneys for Cornerstone admitted during questioning of the Task Force's expert that "bingo, even traditional bingo, is a type of lottery.”

. "U-Pick-Em" was played in the following manner:
"Each player pays one dollar for each chance to win. In exchange the player is given a card containing the numbers 1 through 75. For two dollars a player gets two cards; three dollars, three cards, etc. The player then chooses eight numbers on each card and gives the cards over to a computer operator who feeds the numbers into a computer. In the alternative, the player can elect to let the computer automatically choose the eight numbers per card. Regardless of which method is selected, the computer prints a slip of paper containing the eight numbers and that paper is given to the player. The slip of paper contains rows of numbers which correspond to the numbers selected. If the player paid one dollar the paper contains one row of eight numbers; two dollars results in two rows of eight numbers; etc. Depending on the number between 1 and 75 chosen, the numbers have a letter attached to them. The letter is a 'B,' T,' 'N,' 'G,' or '0/ depending on where the number would fall on a common bingo card. After each player has the slip of paper, the actual playing commences. An announcer calls out 20 numbers; if any player matches each of eight numbers in any given row, that player wins the grand prize. If no one matches all eight numbers during the first 20 calls, the announcer continues to call numbers until the first person to match eight numbers in one row calls bingo. If the winner does not match within the first 20 numbers, the prize is called a consolation prize and is very small when compared to the grand prize. Additionally, if no one wins the grand prize, that prize is increased and carried forward to another night.”
705 So.2d at 531.

. The referenced ordinance is the same as that quoted above from Evans.

. Article 15, § 3a, has since been amended to include “instant bingo.”

. This principle is quite similar to the principle that bingo in this state is a lottery that is only permitted in the Town of White Hall by virtue of Amendment No. 674; thus, the electronic gaming machines at the EC must be playing "bingo” as understood by that amendment in order to be legal.

. The intervenor/defendant was Lodge No. 555, Loyal Order of Moose, presumably because "instant bingo" was played at the lodge.

. The intervenor's list of characteristics included: “[B]oth games involve cards, the amount that may be wagered is regulated, the types of organizations that can participate are similar, the proceeds go to a nonprofit entity, and both are subject to taxation.” 256 Kan. at 761, 887 P.2d at 136.